AMERICAN PAPER INSTITUTE, INC., Petitioner,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Respondent,

Natural Resources Defense Council, Inc., Intervenor.

DELMARVA POWER & LIGHT COMPANY, et al., Petitioners,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Respondent,

Natural Resources Defense Council, Inc., Intervenor.

WESTVACO CORPORATION, Petitioner,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; William K. Reilly, Administrator, Respondents.

The CITY OF AKRON, OHIO, A Municipality, Petitioner,

v.

William K. REILLY, Administrator, United States Environmental Protection Agency; United States Environmental Protection Agency, Respondents,

Natural Resources Defense Council, Inc., Intervenor.

USX CORPORATION, Gary Works, Petitioner,

v.

ENVIRONMENTAL PROTECTION AGENCY and William K. Reilly, Administrator of the United States Environmental Protection Agency, Respondents.

Nos. 89–1499, 89–1590, 89–1612, 89–1773, 90–1265.

United States Court of Appeals, District of Columbia Circuit.

Argued April 15, 1993.

Decided June 22, 1993.

Russell S. Frye, Washington, DC, argued the cause for petitioners American Paper Institute, Inc., USX Corp. and Delmarva Power & Light Co., et al. and the City of Akron, Ohio. With him on the joint briefs were Stephen J. Axtell, Washington, DC, Charles R. McElwee, Charleston, WV, and Kristy N. Bulleit. James R. Walpole, Andrew A. Giaccia and Matthew B. Van Hook, Washington, DC, entered appearances for petitioner American Paper Institute.

Van Carson, Cleveland, OH, filed the brief for petitioner the City of Akron, Ohio.

Manning Gasch, Jr., James N. Christman and Joseph M. Spivey, III, Richmond, VA, entered appearances for petitioner Westvaco Corp.

Michael A. McCord, Asst. Chief, U.S. Dept. of Justice, Washington, DC, argued the cause for respondent. David A. Carson, Atty., U.S. Dept. of Justice and Carol Ann Siciliano, Atty., U.S. E.P.A., Washington, DC, filed the brief for respondent. Richard Stewart, Washington, DC, entered an appearance.

Jessica C. Landman and Robert W. Adler, Washington, DC, filed the brief for intervenor Natural Resources Defense Council, Inc. Richard E. Ayres, Washington, DC, entered an appearance.

Before WALD, BUCKLEY and WILLIAMS, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

In these consolidated petitions for review, the American Paper Institute, Inc., the USX Corporation, Westvaco Corporation, the City of Akron, Ohio and a host of utilities contest several new Environmental Protection Agency ("EPA") regulations interpreting the Clean Water Act ("CWA" or the "Act") and its amendments. The petitioners primarily take issue with an EPA rule requiring writers of pollution discharge permits to use one of three methods to interpret state water quality standards containing so-called "narrative criteria" (*e.g.*, "no toxics in toxic amounts") so as to create precise chemical-specific effluent limitations in those permits. For the reasons discussed below, we find the regulation in question as well as other, related regulations challenged by petitioners to constitute reasonable, authorized attempts at necessary gap-filling in the CWA statutory scheme. Accordingly, we deny the petitions for review.

I.

In enacting the CWA, Congress sought to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Toward that end, Congress constructed a system in which discharges of pollutants into the waters of the United States from "point source[s]"—

"discernable, confined and discrete conveyance[s]," 33 U.S.C. § 1362(14), such as factory pipes—are normally permissible only if made pursuant to the terms of a National Pollution Discharge Elimination System ("NPDES") permit. *See* 33 U.S.C. §§ 1311(a), 1342. Under the Act, those licenses must be obtained from the EPA or, in the approximately 40 states the EPA has authorized to administer their own NPDES program, from a designated state agency. *See* 33 U.S.C. § 1342(a)–(d); *see also* 57 Fed. Reg. 43,733, 43,734–35 (1992) (listing states with permitting authority). In either case, section 301 of the Act mandates that every permit contain (1) effluent limitations that reflect the pollution reduction achievable by using technologically practicable controls, *see* 33 U.S.C. § 1311(b)(1)(A), and (2) any more stringent pollutant release limitations necessary for the waterway receiving the pollutant to meet "water quality standards." 33 U.S.C. § 1311(b)(1)(C).

Of primary importance in this case is section 301's second requirement—*i.e.*, that permits contain discharge limitations sufficient to assure that the receiving waterway satisfies water quality standards. Under the CWA, the water quality standards referred to in section 301 are primarily the states' handiwork. State water quality standards in effect at the time of the Act's passage in 1972 were deemed to be the initial water quality benchmarks for CWA purposes (so long as the standards passed an EPA review). *See* 33 U.S.C. § 1313(a). The states were to revisit and, if necessary, revise those initial standards at least once every three years—a process commonly known as triennial review. *See* 33 U.S.C. § 1313(c)(1). Triennial reviews consist of public hearings in which current water quality standards are examined to assure that they "protect the public health or welfare, enhance the quality of water and serve the purposes" of the Act. 33 U.S.C. § 1313(c)(2)(A). Additionally, the CWA directs states to consider a variety of competing policy concerns during these reviews, including a waterway's "use and value

for public water supplies, propagation of fish and wildlife, recreational purposes, and agricultural, industrial, and other purposes." *Id.*

In accord with Congress' intent to cast the states in the featured role in the promulgation of water quality standards, the EPA may step in and promulgate water quality standards itself only in limited circumstances. It may act only where (1) it determines that a state's proposed new or revised standard does not measure up to CWA requirements *and* the state refuses to accept EPA-proposed revisions to the standard or (2) a state does not act to promulgate or update a standard but, in the EPA's view, a new or revised standard is necessary to meet CWA muster. *See* 33 U.S.C. § 1313(c)(3)–(4).

The water quality standards that emerge from this state/federal *pas de deux* have two primary components: designated "uses" for a body of water (*e.g.*, public water supply, recreation, agriculture) and a set of "criteria" specifying the maximum concentration of pollutants that may be present in the water without impairing its suitability for designated uses. *See* 33 U.S.C. § 1313(c)(2)(A). Criteria, in turn, come in two varieties: specific numeric limitations on the concentration of a specific pollutant in the water (*e.g.*, no more than .05 milligrams of chromium per liter) or more general narrative statements applicable to a wide set of pollutants (*e.g.*, no toxic pollutants in toxic amounts).[1] *See also Environmental Defense Fund, Inc. v. Costle*, 657 F.2d 275, 288 (D.C.Cir.1981) (approving the use of narrative criteria). In deciding what criteria suit particular designated uses, the states are not left entirely to their own devices. As required by the CWA, *see* 33 U.S.C. § 1314(a)(1), the EPA has promulgated a set of *recommended* numeric criteria for certain listed pollutants that the states can, and quite often do, refer to in selecting appropriate criteria. *See* 57 Fed.Reg. 60,848, 60,874 (1992) (EPA notes that states generally rely on recommended criteria in establishing water quality standards).

---

1. There is one exception to this rule. Under the 1987 amendments to the CWA, discussed *infra* at pages 352–53, states were required to adopt, in their next triennial review, numeric criteria or criteria based on biological monitoring for certain specific toxic pollutants. *See* 33 U.S.C. § 1313(c)(2)(B).

Of course, the water quality standards by themselves have no effect on pollution; the rubber hits the road when the state-created standards are used as the basis for specific effluent limitations in NPDES permits. As noted above, once a water quality standard has been promulgated, section 301 of the CWA requires all NPDES permits for point sources to incorporate discharge limitations necessary to satisfy that standard. *See, e.g., Westvaco Corp. v. EPA*, 899 F.2d 1383, 1385 (4th Cir.1990). On its face, section 301 imposes this strict requirement as to all standards—*i.e.*, permits must incorporate limitations necessary to meet standards that rely on narrative criteria to protect a designated use as well as standards that contain specific numeric criteria for particular chemicals. The distinctive nature of each kind of criteria, however, inevitably leads to significant distinctions in how the two types of criteria are applied to derive effluent limitations in individual permits. When the standard includes numeric criteria, the process is fairly straightforward: the permit merely adopts a limitation on a point source's effluent discharge necessary to keep the concentration of a pollutant in a waterway at or below the numeric benchmark. Narrative criteria, however, present more difficult problems: How is a state or federal NPDES permit writer to divine what limitations on effluent discharges are necessary to assure that the waterway contains, for example, "no toxics in toxic amounts"? Faced with this conundrum, some permit writers threw up their hands and, contrary to the Act, simply ignored water quality standards including narrative criteria altogether when deciding upon permit limitations. *See Natural Resources Defense Council v. EPA*, 915 F.2d 1314, 1317 (9th Cir.1990). Additionally, when standards containing narrative criteria were enforced—often through the device of whole effluent discharge limitations based on biological monitoring techniques,[2] *see* 48 Fed.Reg. 51,400, 51,402 (1983) (noting that biological monitoring is one method of testing compliance with narrative criteria)—the lack of standardized

procedures made it impossible to even approximate consistency in the translation of criteria into permit limitations. *Cf.* 57 Fed. Reg. 60,848, 60,851 (1992). Moreover, the biological monitoring techniques relied on to enforce narrative criteria were better suited to assuring protection of aquatic life than human health. *See* 131 Cong.Rec. 15,324 (1985) (Statement of Senator Stafford). Thus, in the EPA's view, the lack of a required procedure for developing water-quality-based permit limits from narrative criteria hamstrung attempts to fulfill the statutory requirement that NPDES permits contain limitations necessary to meet all water quality standards. *See* 54 Fed.Reg. 23,868, 23,877 (1989) (noting that the EPA's legal obligation to assure that NPDES permits meet *all* applicable water quality standards could not be set aside until states promulgate numeric water quality criteria for all their standards).

## II.

A. *Interpreting Narrative Criteria to Create Chemical-specific Limitations*

To address these difficulties, the EPA promulgated the regulation under attack here, 40 C.F.R. § 122.44(d)(1)(vi). That rule requires NPDES permit writers to use one of three mechanisms to translate relevant narrative criteria into *chemical-specific* effluent limitations. Specifically, the regulation provides that a permit writer must establish effluent limits from narrative criteria by using (1) a calculated numeric water quality criterion derived from such tools as a proposed state numeric criterion or an "explicit state policy or regulation interpreting its narrative water quality criterion"; (2) the EPA recommended numeric water quality criteria, but only on a "case-by-case basis" and "supplemented where necessary by other relevant information"; and/or (3) assuming certain conditions are met, limitations on the discharge of an "indicator parameter," *i.e.*, a different pollutant also found in the point source's effluent.[3]

---

2. Biological monitoring, according to the EPA, includes such devices as "periodic sampling of the ecosystem, trend monitoring and/or periodic bioassays using the effluent." 48 Fed.Reg. at 51,402.

3. The regulation states in pertinent part:

Where a State has not established a water quality criterion for a specific chemical pollutant that is present in an effluent at a concen-

■ We employ familiar principles in reviewing the disputed regulation. Unless we find that the EPA's rule contravenes the unambiguously conveyed intent of Congress as to this precise issue, we will reject the petitioners' challenge so long as the regulation appears designed to implement the statutory scheme by reasonable means. *See generally Chevron USA Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984).

■ In arguing that the EPA's rule flunks the first prong of this test, the petitioners highlight the alleged tension between the regulation's delegation of authority to a permit writer to interpret narrative criteria in each particular case and the CWA system, outlined above, in which generally applicable water quality standards are adopted by the states only after public input and the weighing of the competing policy considerations set out in the Act. In function if not in form, petitioners argue, the EPA regulation requires states to cede their standard-setting authority to an unaccountable bureaucrat: "Under the EPA regulations challenged here ... water quality standards (or at least the required 'criteria' portion of water quality standards) are created on a case-by-case basis for individual discharges by an EPA or state permit writer...." Petitioners' Brief at 24.

We are unpersuaded. As we understand it, the regulation does not supplant—either formally or functionally—the CWA's basic statutory framework for the creation of water quality standards; rather, it provides alternative mechanisms through which *previously adopted* water quality standards containing narrative criteria may be applied to

create effective limitations on effluent emissions. As long as narrative criteria are permissible—and the petitioners do not contend that they are not—and must be enforced through limitations in particular permits, a permit writer will inevitably have some discretion in applying the criteria to a particular case. The general language of narrative criteria can only take the permit writer so far in her task. Of course, that does not mean that the language of a narrative criterion does not cabin the permit writer's authority at all; rather, it is an acknowledgement that the writer will have to engage in some kind of interpretation to determine what chemical-specific numeric criteria—and thus what effluent limitations—are most consistent with the state's intent as evinced in its generic standard. The EPA's new regulation merely requires that permit writers engage in this task to create chemical-specific limitations on discharges of pollutants and gives those writers three tools with which to do this work in a fairly regularized fashion. *See* 54 Fed.Reg. 23,868, 23,877 (1989); *see also id.* at 23,875 ("State narrative water quality criteria provide the legal basis for establishing effluent limits under paragraphs (d)(1)(v) and (d)(1)(vi) of today's regulations."). The regulation thus seems to provide an eminently reasonable means of effectuating the intent of the previously adopted narrative criteria as well as Congress' own intent, made explicit in section 301 of the CWA, that *all* state water quality standards be enforced through meaningful limitations in individual NPDES permits.

Petitioners' related argument that the regulation clashes with Congress' intent to give the states the leading role in creating water quality standards also fails, despite petitioners' highlighting of two additional factors

tration that causes, has the reasonable potential to cause, or contributes to an excursion above a narrative criterion within an applicable State water quality standard, the permitting authority must establish effluent limits using one or more of the following options:

(A) Establish effluent limits using a calculated numeric water quality criterion for the pollutant which the permitting authority demonstrates will attain and maintain applicable narrative water quality criteria and will fully protect the designated use. Such a criterion may be derived using a proposed State criterion, or

an explicit State policy or regulation interpreting its narrative water quality criterion, supplemented with other relevant information ...; or

(B) Establish effluent limits on a case-by-case basis, using EPA's water quality criteria, published under section 307(a) of the CWA, supplemented where necessary by other relevant information; or

(C) Establish effluent limitations on an indicator parameter for the pollutant of concern, provided: ....

40 C.F.R. § 122.44(d)(1)(vi).

they say expose improper federal usurpation of state prerogatives. First, they note that one of the three alternative interpretive mechanisms allowed under the regulation relies on the recommended federal numeric criteria to determine what a state narrative criterion means. But that option is of course only one of three choices enumerated in the regulation. *See id.* at 23,876–77 ("EPA is not requiring states to use EPA's water quality criteria. EPA is offering the water quality criteria as one of three options available to the state for interpreting and applying narrative water quality criteria."). Moreover, the option in question does not require state or federal permit writers to apply the federal guidelines "whole hog"; the federal standard is to be employed on a "case-by-case basis," and may be "supplemented where necessary by other relevant information." 40 C.F.R. § 122.44(d)(1)(vi)(B). Thus, this alternative requires a permit writer to tailor the federal standard to any relevant site-specific circumstances in order to effectuate the intent of a particular state narrative criterion. *Cf. Simpson Tacoma Kraft Co. v. Department of Ecology,* 119 Wash.2d 640, 835 P.2d 1030 (1992) (invalidating, under state law, the state's adoption of a federal numeric criterion for dioxin that the state applied without considering site-specific factors). In sum, we are not persuaded that the regulation's inclusion—as one of three choices—of an interpretive mechanism that uses the recommended federal criteria only as a starting point impermissibly alters the statutorily created balance of state and federal power.

Petitioners' second argument based on federalism concerns stresses the fact that in the handful of states where the federal government still runs the NPDES permit program, a *federal* permit writer is now charged with interpreting the state standard. Of course, federal writers had been performing this function long before the promulgation of the regulation at issue here. Moreover, the CWA provides states with ample legal recourse if the federal employee strays from the state's understanding of its yardstick. Specifically, under section 401 of the Act, a state may refuse to certify a permit—and thus stop its issuance—if the permit limitations do not "comply" with the state's interpretation of its water quality standards. *See* 33 U.S.C. § 1341(a)(1)[4]; *see also In Re Ina Road Water Pollution Control Facility,* NPDES Appeal No. 84–12, slip opinion at 3–4 (1985) (where state reasonably certifies a particular limitation as consistent with its water quality standards, EPA may not mandate *more* stringent limitations); *cf.* 40 C.F.R. § 124.55(e) ("Review and appeals of limitations and conditions attributable to State certification shall be made through the applicable procedures of the State...."). The state's ability to deny certification ultimately assures that, under the new regulatory regime as well as under the old, it has sufficient firepower to insist that its standards are accurately interpreted by federal employees.

■ Petitioners' final argument of substance against the EPA's rule derives from section 303(c)(2)(B) of the CWA, 33 U.S.C. § 1313(c)(2)(B).[5] That subsection, enacted

---

4. "Any applicant for a Federal license or permit to conduct any activity ... which may result in any discharge into the navigable waters, shall provide the licensing or permitting agency a certification from the State in which the discharge originates or will originate ... that any such discharge will comply with the applicable provisions of sections 1311, 1312, 1313, 1316, and 1317 of this title.... No license or permit shall be granted until the certification required by this section has been obtained...."

5. That provision states:
Whenever a State reviews water quality standards pursuant to paragraph (1) of this subsection [requiring triennial reviews], or revises or adopts new standards pursuant to this paragraph, such State shall adopt criteria for all toxic pollutants listed pursuant to section 1317(a)(1) of this title for which criteria have been published under section 1314(a) of this title, the discharge or presence of which in the affected waters could reasonably be expected to interfere with those designated uses adopted by the State, as necessary to support such designated uses. Such criteria shall be specific numerical criteria for such toxic pollutants. Where such numerical criteria are not available, whenever a State reviews water quality standards pursuant to paragraph (1), or revises or adopts new standards pursuant to this paragraph, such State shall adopt criteria based on biological monitoring or assessment methods consistent with information published pursuant to section 1314(a)(8) of this title. Nothing in this section shall be construed to limit or

as part of the 1987 Water Quality Amendments, required states, in their next triennial reviews, to formulate numeric criteria for certain priority toxic pollutants listed in the EPA guidelines. If numeric criteria for those listed toxics were "not available," the provision mandated that states enact criteria based on biological monitoring techniques. The petitioners claim that this amendment would have been totally unnecessary if Congress thought that the EPA had the authority to interpret preexisting narrative criteria into numeric criteria. Not so. First, section 303's directives say nothing about chemicals other than the listed toxics. There are thus many pollutants of concern for which section 303 does not require numeric criteria. Additionally, even as to the listed chemicals for which states had to adopt numeric criteria, the regulation at issue complements section 303 quite nicely. The regulation allowed permit writers to put in place new chemical-specific limitations through interpretation of existing narrative criteria until states had an opportunity to adopt specific numeric criteria—which would of course avoid the inevitable marginal imprecision inherent in the interpretive task required under the EPA regulation—in the course of their next triennial review. *See* 54 Fed.Reg. at 23,877 (describing the EPA regulation as an "interim measure" until states formulate numeric criteria). Although, as the petitioners point out, Congress did not expressly authorize use of such an interim measure, the agency's initiative seems a preeminent example of

gap-filling in the interest of a continuous and cohesive regulatory regime; the EPA has plugged an obvious hole in the CWA scheme in a way that is both reasonable and consistent with (1) Congress' long-standing directive that permits contain limitations necessary to meet all water quality standards and (2) Congress' more recently expressed preference, evident in section 303(c)(2)(B), for numeric criteria. In sum, we see no problem with the agency's efforts.[6]

## B. *The EPA's Reading of the Term "Applicable Standard"*

Besides requiring that states adopt numeric criteria for priority toxic pollutants, the 1987 Water Quality Amendments included a provision intended to focus regulatory attention on "toxic hotspots"—waters where, even with the implementation of best available technology controls, severe toxic contamination would still exist. Specifically, Congress required states to compile three lists of impaired waters. Section 304($l$)(1)(A) of the CWA mandated submission to the EPA of an "A(i) List" of waters that cannot attain or maintain the "water quality standards for such waters reviewed, revised, or adopted in accordance with" section 303(c)(2)(B) of the CWA—which, as discussed above, required states to create numeric criteria for priority toxics during their next triennial review—as well as an "(A)(ii) List" of waters that were not anticipated to reach "that water quality which shall assure protection of public health, public water supplies, [and other uses]." 33

---

delay the use of effluent limitations or other permit conditions based on or involving biological monitoring or assessment methods or previously adopted numerical criteria.

6. The petitioners also argue that the savings clause inserted at the end of section 303(c)(2)(B) ("[n]othing in this section shall be construed to limit or delay the use of effluent limitations or other permit conditions based on or involving biological monitoring or assessment methods or previously adopted numerical criteria") shows that the EPA regulation is inconsistent with the CWA scheme. Specifically, they allege that because this savings clause did not refer to narrative criteria being interpreted to derive numeric criteria for chemical-specific discharge limitations, Congress could not have intended to authorize such a mechanism. *See also* 131 Cong. Rec. 15,324 (1985) (statement of Senator Staf-

ford, Chair of the Senate Environment and Public Works Committee, indicating his belief that the lack of numeric criteria was a significant problem because only such criteria could provide the basis for chemical-specific discharge limitations). However, neither the savings clause— which, by its own terms, does not speak exclusively—nor Senator Stafford's remark is determinative of a congressional intent to bar EPA authority to use such a mechanism to create chemical-specific limitations. We think, at most, they demonstrate that Congress was not aware of the translation methodology that the EPA later developed in this regulation. As pointed out, that methodology is entirely consistent with the broader intent evident in the passage of section 303(c)(2)(B) and indeed in Senator Stafford's comment itself: Congress' preference for chemical-specific NPDES permit limitations based on state water quality standards.

U.S.C. § 1314($l$)(1)(A). The third list, included in section 304($l$)(1)(B) and known as the "B List," consisted of waters for which the state did not expect "the applicable standard under section 1313 [requiring states to set water quality standards to] be achieved after [technology-based] requirements ... are met, due entirely or substantially to discharges from point sources of any [listed] toxic pollutants." 33 U.S.C. § 1314($l$)(1)(B). Each state was also required to file, in 1989, a list (the "C List") of *point sources* "preventing or impairing" the quality of waters on the first three lists. *See* 33 U.S.C. § 1314($l$)(1)(C); *see also Natural Resources Defense Council*, 915 F.2d at 1320–22 (invalidating EPA regulation that required listing of only the point sources that impaired waters on the B List). For all C List point sources discharging into B List waters, states had to file an individual control strategy ("ICS")—a plan to reduce point source discharges to a degree sufficient to allow a waterway to attain water quality standards within three years. *See* 33 U.S.C. § 1314($l$)(1)(D); 40 C.F.R. § 123.46(a).[7] Through regulation, the EPA has defined an ICS as a final or draft NPDES permit accompanied by supporting documents showing how the permit's limitations would allow the water segment to attain relevant water quality standards within three years. *See* 40 C.F.R. § 123.46(c).

Since the EPA's current interpretation of the statute holds that only point sources discharging into B List waters are subject to the high-priority procedures of the ICS program, whether a waterway qualifies for the B List is an issue with critical practical consequences. Waters are to be placed on the B List if the state does not expect "the applicable standard under section 1313 [requiring states to set water quality standards to] be achieved after [technology-based] requirements ... are met, due entirely or substantially to discharges from point sources of any [listed] toxic pollutants." 33 U.S.C. § 1314($l$)(1)(B). The statute does not go on to specify what constitutes an "applicable standard" under section 304($l$)(1)(B), but the EPA has defined the term as follows:

> *[A]pplicable standard* means a numeric criterion for a priority pollutant promulgated as part of a state water quality standard. Where a state numeric criterion for a priority pollutant is not promulgated as part of a state water quality standard, for the purposes of listing waters "applicable standard" means the state narrative water quality criterion to control a priority pollutant ... interpreted on a chemical-by-chemical basis by applying a proposed state criterion, an explicit state policy or regulation, or an EPA national water quality criterion, supplemented with other relevant information.

40 C.F.R. § 130.10(d)(4).

Petitioners argue that this definition is both inconsistent with the CWA and arbitrary and capricious.[8] In their view, by

---

**7.** The "ICS provision" is the focus of controversy. In *Natural Resources Defense Council,* the Ninth Circuit, besides invalidating the EPA's interpretation of the listing requirement, told the EPA to reconsider its position that only point sources on B List waters, and not those on either of the A Lists, were subject to ICSs. *See* 915 F.2d at 1323. The EPA has since issued new proposed regulations that would also not require ICSs for C List point sources on A(i) or A(ii) List waters, *see* 57 Fed.Reg. 33,051, 33,052 (1992), but those proposed regulations have been challenged, and no final rules have yet been issued. *See also infra* note 8 (explaining why controversy on this point does not render the issue before us unripe).

**8.** The Natural Resources Defense Council ("NRDC"), an intervenor in this court, argues that the petitioners' claims about the definition of an "applicable standard" are both moot and unripe. Its mootness argument is as follows: The only effect of waters being placed on the B list is that point sources on those waters are subject to an ICS, *i.e.*, sped up NPDES permitting. Since all point sources, whether or not subject to an ICS, must obtain new permits every five years, even if they are not subject to ICS treatment, petitioners would have had to obtain a new permit by now anyway, since five years have passed since the passage of the relevant amendment. This argument fails, however, because the statute not only requires expedited permitting of point sources subject to ICSs, it also mandates that those sources attain applicable water quality standards within three years of the establishment of the ICS. *See* 33 U.S.C. § 1314($l$)(1)(C). Since there is no similarly strict compliance deadline elsewhere in the Act, the issue of what waters are on the B List still has sufficient consequences so as not to render the controversy moot.

referring to "applicable standard[s]," Congress meant only already existing standards containing *numeric* criteria; the EPA's regulation is consequently invalid to the extent it considers standards based on *narrative* criteria to be "applicable." Petitioners contend that "applicable standard[s]" cannot have been meant to include standards containing narrative criteria because, since all states have narrative "no toxics" standards, the EPA's reading would result in there *always* being an "applicable" standard. This reading is untenable, the argument goes on, because it effectively strikes the allegedly limiting adjective "applicable" from the statute. Elaborating on this theory, petitioners note that in contrast to subsection (A), where Congress referred simply to "water quality standards" in specifying the content of the A(i) list, in subsection (B) Congress used the term "applicable standard." By using these different terms, they contend, Congress indicated that the A(i) and B Lists were to refer to differing sets of water quality standards. Finally, petitioners seek support for their more limited interpretation of "applicable standards" from CWA section 303(c)(2)(B), the subsection that requires states to create numeric criteria for toxic pollutants during their next triennial review. Read together, they say, section 304(*l*)(1)—the section that requires the states to create these one-time-only lists and mandates that states formulate ICSs for at least some of the point sources discharging into those waters—and section 303(c)(2)(B) show that Congress intended to "require states to promulgate the numerical water quality criteria for toxic pollutants that Congress believed was necessary to regulate

discharges of those pollutants, while at the same time requiring that those limited situations where applicable [numeric] water quality standards for toxic pollutants were already known to be violated be addressed promptly through the development of Individual Control Strategies, even prior to promulgation of additional [numeric] water quality criteria under CWA Section 303(c)(2)(B)." Reply Brief at 22–23.

■ These arguments (as well as others raised by petitioners [9]) do not convince us that the EPA's broader construction of the term "applicable standard" is unreasonable. *See generally Chevron,* 467 U.S. at 843–44, 104 S.Ct. at 2781–83 (where statute is ambiguous on a particular question, we defer to any reasonable construction proffered by the implementing agency). The terms "standards" and "applicable standard[s]" are used in the statute in totally different contexts to refer to totally different sets of water quality standards. The "standards" governing the (A)(i) List, which includes all waters that will not meet new numeric criteria to be enacted during each state's forthcoming triennial review due to pollution from point *or* nonpoint sources, are obviously future, statutorily prescribed standards. The "applicable standard[s]" governing the B list, in contrast, focus on identifying waters that do not meet *existing* water quality standards because of *point source* pollution and thus mark a different set of troubled waters than those on the A(i) list; there is accordingly no reason why a major difference in meaning should be ascribed to a minor difference in phraseolo-

The NRDC's argument that this controversy is not ripe is based on the fact that the EPA is currently considering whether point sources discharging into waters on *all three lists* are subject to ICS treatment. *See supra* note 7. According to the NRDC, if the EPA decides to go that route, the petitioners' dispute with the agency over what is an "applicable standard" under section 304(*l*)(1)(B) will be mooted because it will not matter whether a water is on the B List. But since the EPA is currently requiring ICSs for point sources on B list waters only, *see* 40 C.F.R. § 123.46, and we have no way of knowing whether it might change its mind down the road (or be required to do so), the NRDC's ripeness claim also fails to persuade. *See Abbott Laboratories v. Gardner,* 387 U.S. 136, 148–50, 87 S.Ct. 1507, 1515–16, 18 L.Ed.2d 681 (1967) (ripeness

inquiry requires a pragmatic assessment of finality of the decision and hardship to the parties).

9. Since the EPA's definition of the term "applicable standard[s]" covers those standards containing narrative criteria "interpreted on a chemical-by-chemical basis by applying a proposed state criterion, an explicit state policy or regulation, or an EPA national water quality criterion, supplemented with other relevant information," petitioners predictably raise the same arguments rejected previously about the propriety of interpreting narrative criteria to create chemical-specific numeric limitations. These contentions are no more persuasive in this context than in the prior one.

gy. Moreover, in its own context, the EPA's definition of "applicable standard" seems quite reasonable, if indeed not required. Standards based on narrative criteria were among those "applicable" to state waters at the time of the 1987 amendments to the CWA, and, despite the petitioners' speculations to the contrary (based largely on the alleged interplay between this subsection and section 303(c)(2)(B), *see supra* page 355), there is no evidence in the text or history of the CWA or its amendments that Congress was concerned only with violations of numeric criteria. Thus, we conclude that the term "applicable standard[s]" may plausibly be interpreted to include all standards that apply to state waters—including those standards that contain narrative criteria. *See Natural Resources Defense Council*, 915 F.2d at 1319 n. 5 ("[P]aragraph B refers to *all* water quality standards....") (emphasis added); *see generally Chevron*, 467 U.S. at 844, 104 S.Ct. at 2782 (where there has been an implicit delegation of a particular question to the expert agency, "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator" of that agency).[10]

### CONCLUSION

For the foregoing reasons, we deny the petitions for review.

*So ordered.*

---

**10.** Finally, the petitioners contend that the EPA's regulations regarding placement of waters on the B List fail to take account of the explicit statutory requirement that the list contain only waters not expected to meet the applicable standard "after the requirements of sections 1311(b), 1316, and 1317(b) of this title [enumerating technology-based standards] are met." 33 U.S.C. § 1314(*l*)(1)(B). This argument is without merit. The petitioners focus on one subsection of the regulation, 40 C.F.R. § 130.10(d)(5), and ignore another subsection, 40 C.F.R. § 130.10(d)(2), that incorporates the relevant statutory requirement regarding technology-based standards. The two provisions must be read in tandem— indeed, the subsection petitioners challenge cross-references the one that incorporates the relevant statutory requirement.