2016 IL App (1st) 150971

SIXTH DIVISION
February 26, 2016

No. 1-15-0971

| | | |
|---|---|---|
| PRAIRIE RIVERS NETWORK; NATURAL RESOURCES DEFENSE COUNCIL; SIERRA CLUB, ENVIRONMENTAL LAW AND POLICY CENTER; FRIENDS OF THE CHICAGO RIVER; and GULF RESTORATION NETWORK, | ) ) ) ) ) | Petition for Review of an Order of the Illinois Pollution Control Board |
| | ) | |
| | ) | Pollution Control Board |
| Petitioners-Appellants, | ) | Nos.   14-106 |
| | ) | 14-107 |
| v. | ) | 14-108 |
| | ) | |
| THE ILLINOIS POLLUTION CONTROL BOARD; THE ILLINOIS ENVIRONMENTAL PROTECTION AGENCY; and METROPOLITAN WATER RECLAMATION DISTRICT OF GREATER CHICAGO, | ) ) ) ) ) ) | |
| | ) | |
| Respondents-Appellees. | ) | |

PRESIDING JUSTICE ROCHFORD delivered the judgment of the court, with opinion.
Justices Hoffman and Delort concurred in the judgment and opinion.

**OPINION**

¶ 1    The Illinois Environmental Protection Agency (IEPA) issued permits allowing for the operation of three different water reclamation plants under the control of the Metropolitan Water Reclamation District (District).   After the IEPA issued those permits, the six petitioners, Prairie Rivers Network, Natural Resources Defense Council, Sierra Club, Environmental Law & Policy Center, Friends of the Chicago River, and Gulf Restoration Network, filed petitions for review with the Illinois Pollution Control Board (Board).   Petitioners alleged that the IEPA erred in issuing the permits because it failed to include conditions ensuring that discharges of phosphorus do not violate applicable Illinois water quality standards.   The parties filed cross-motions for summary judgment.   The Board denied petitioners' motion for summary judgment and granted summary judgment to the IEPA and the District, thereby upholding the issuance of the permits.

No. 1-15-0971

Petitioners appeal. Because we find genuine issues of material fact exist, we reverse and remand for further proceedings.

¶ 2    The District treats approximately 1.4 billion gallons of wastewater every day at its seven water reclamation plants. The water reclamation plants discharge the treated water, or effluent, into both natural and man-made waterways pursuant to National Pollutant Discharge Elimination System (NPDES) permits issued by the IEPA. The Federal Water Pollution Control Act (Clean Water Act) (33 U.S.C. § 1342 (2012)), established the NPDES permit program as the national framework for regulating wastewater discharges into waterways from point sources, such as the outfalls from the District's water reclamation plants. See 33 U.S.C. § 1362(14) (2012).

¶ 3    The IEPA and the Board each have distinct roles in the issuing of NPDES permits in Illinois. The IEPA is authorized under the Environmental Protection Act (Act) to issue NPDES permits. See 415 ILCS 5/39 (West 2014). The Board regulates the standards and procedures that must be met before the IEPA may approve permits under the Act. See 415 ILCS 5/13(b) (West 2014). The Board has established specific regulations (discussed later in this order) "to preserve the integrity of bodies of water in Illinois affected by [the] IEPA's issuance of a NPDES permit." *Illinois Environmental Protection Agency v. Illinois Pollution Control Board*, 386 Ill. App. 3d 375, 381 (2008).

¶ 4    The IEPA must comply with the Act and the Board's general water quality regulations to protect and maintain water quality standards in Illinois before issuing a NPDES permit. *Id*.

¶ 5    In the present case, the IEPA issued NPDES permits to the District for each of its water reclamation plants allowing the District to discharge effluent for a set period of time and in accordance with set criteria. In August 2006, the District applied to the IEPA for reissuance of

its existing NPDES permits for its three largest water reclamation plants: the Stickney plant, the Calumet plant, and the O'Brien plant.

¶ 6    The Stickney plant is situated in Cicero and treats wastewater from sections of Chicago and its suburbs. Its main outfall discharges to the Chicago Sanitary and Ship Canal.

¶ 7    The Calumet plant, located in Chicago, treats wastewater from areas of Chicago and the south suburbs. Its main outfall discharges to the Little Calumet River.

¶ 8    The O'Brien plant, located in Skokie, treats wastewater from parts of Chicago and the suburbs. Its main outfall discharges to the North Shore Channel.

¶ 9    In November 2009, the IEPA issued draft permits for the Stickney, Calumet and O'Brien plants that did not include any numeric limits on the amount of phosphorus discharged. The IEPA ordered a public comment period to run through mid-December 2013. In late 2009, petitioners submitted comments stating that the permits should include limits on the water reclamation plants' phosphorus discharges.

¶ 10    Petitioners contended that high levels of phosphorus discharged by the Stickney, Calumet, and O'Brien water reclamation plants contribute to the growth of excess levels of algae and plants in both receiving and downstream waters, which in turn leads to wide fluctuations in dissolved oxygen levels over a 24-hour period, as the plants and algae produce oxygen during daytime hours and breathe it at night.

¶ 11    Petitioners discussed how such phosphorus pollution is causing or contributing to non-compliance with applicable water quality standards. The water quality standards cited were those involving certain numeric and narrative standards. The numeric standards provide that dissolved oxygen concentrations shall not fall below certain specific numeric limitations set by the Board. See 35 Ill. Adm. Code 302.206, 302.405, amended at 39 Ill. Reg. 9388 (eff. July 1,

2015). The more general narrative standards set by the Board requires Illinois bodies of water to be free from unnatural plant or algal growth. See 35 Ill. Adm. Code 302.203, amended at 39 Ill. Reg. 9388 (eff. July 1, 2015) ("waters of the State shall be free from sludge or bottom deposits, floating debris, visible oil, odor, plant or algal growth, color or turbidity of other than natural origin"), and 35 Ill. Adm. Code 302.403, amended at 39 Ill. Reg. 9388 (eff. July 1, 2015) ("Waters subject to this subpart shall be free from unnatural sludge or bottom deposits, floating debris, visible oil, odor, unnatural plant or algal growth, or unnatural color or turbidity.").

¶ 12    Petitioners offered expert testimony, scientific treatises, and water quality criteria developed by the Environmental Protection Agency (USEPA) and other states showing that levels of phosphorus in the water bodies need to be *below* 1.0 mg/L in order to prevent violations of the numeric and narrative standards.

¶ 13    Petitioners summarized findings of the IEPA that the waters receiving effluent from the Stickney, Calumet, and O'Brien plants, are impaired for aquatic life, with phosphorus and low dissolved oxygen listed as potential causes.

¶ 14    After the close of the public comment period and following review of data supplied by the District, officials of the USEPA stated that the IEPA should conduct an analysis of the effects of the District's phosphorus discharges on water quality. In October 2011, the IEPA and USEPA made a joint plan for an extensive study of the effects of the District's phosphorus discharges.

¶ 15    Later that month, the District proposed an implementation plan for a phosphorous effluent limit of 1.0 mg/L at each of the plants, envisioning that the O'Brien plant come into compliance in 10 years, the Calumet plant come into compliance in six years, and the Stickney plant come into compliance in four years. Compliance with the 1.0 mg/L phosphorus effluent limit will reduce the phosphorus discharge from the District plants by nearly 50%. However,

the District pointed to no data showing why it did not propose a phosphorus effluent limit *below* 1.0 mg/L, in accordance with the phosphorus levels set by other states and as recommended by the USEPA.

¶ 16    Plans to develop scientifically based phosphorus limits continued for over a year after the District proposed the 1.0 mg/L limit.   The District agreed to participate in a phosphorus impact study, and its monitoring and research department was working on a proposal as late as December 6, 2012.   Later in December 2012, though, the District decided not to participate in the phosphorus impact study because it did not believe such a study would be productive.

¶ 17    The IEPA submitted revised draft permits in October 2013.  The USEPA informed the IEPA that it did not object to issuance of any of the permits.

¶ 18    In December 2013, the IEPA issued final permits for the three plants.   Each permit imposed a 1.0 mg/L effluent limit for total phosphorus in accordance with the District's proposal. The IEPA also included a "special condition," expressly mandating that the District's effluent cannot cause or contribute to water quality violations.  Under another special condition, the IEPA can modify the permits and impose more stringent effluent limits if necessary to comply with any new laws, regulations, or judicial orders.

¶ 19    On January 27, 2014, petitioners filed separate petitions asking the Board to review each of the three permits.  These third-party petitions to the Board were brought pursuant to sections 40(e)(1) and 40(e)(2) of the Act (415 ILCS 5/40(e)(1), (2) (West 2014)).  Petitioners bore the burden of proving that the permits violated the Act and/or the Board's regulations.  *Illinois Environmental Protection Agency*, 386 Ill. App. 3d at 382.

¶ 20    The petitions named both the District and the IEPA as respondents.   In each action, petitioners argued that the 1.0 mg/L effluent limit for phosphorus was not stringent enough to

prevent violations of water quality standards. Therefore, petitioners argued that the issuance of the permits violated the Act (415 ILCS 5/1 *et seq*. (West 2014)), and the Board's corresponding regulations. 35 Ill. Adm. Code 101.100 *et seq*. (2015).

¶ 21 On March 6, 2014, the Board consolidated petitioners' three separate petitions. The parties subsequently filed cross-motions for summary judgment.

¶ 22 On December 18, 2014, the Board granted summary judgment for respondents and denied petitioners' motion for summary judgment. Petitioners filed a motion for reconsideration, which the Board denied. Petitioners appealed directly to this court pursuant to section 41(a) of the Act (415 ILCS 5/41(a) (West 2014)). Petitioners argue that the Board erred in denying their motion for summary judgment and granting summary judgment for respondents. The Board entered the summary judgment order for respondents pursuant to section 101.516(b) of Title 35 of the Illinois Administrative Code (35 Ill. Adm. Code 101.516(b), amended at 39 Ill. Reg. 12848 (eff. Sept. 8, 2015)), which states:

> "If the record, including pleadings, depositions and admissions on file, together with any affidavits, shows that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law, the Board will enter summary judgment."

¶ 23 Section 101.516(b) mirrors section 2-1005(c) of the Illinois Code of Civil Procedure (735 ILCS 5/2-1005(c) (West 2014)), which provides for summary judgment in civil proceedings, and for which the standard of review is *de novo*. We employ the same *de novo* standard of review here. See *Romano v. Municipal Employees Annuity & Benefit Fund*, 384 Ill. App. 3d 501, 503 (2008) (employing the *de novo* standard of review when reviewing the administrative agency's grant of summary judgment).

¶ 24    Because the parties here filed cross-motions for summary judgment, they have agreed that no genuine issue of material fact exists and that only a question of law is involved. *Harwood v. McDonough*, 344 Ill. App. 3d 242, 245 (2003).  However, the mere filing of cross-motions for summary judgment does not establish that there is no issue of material fact, nor does it obligate the Board to render summary judgment.  *Pielet v. Pielet*, 2012 IL 112064, ¶ 28.

¶ 25    Review of the record indicates that genuine issues of material fact exist as to whether the IEPA complied with the Act and the corresponding federal and Board regulations when issuing final permits for the Stickney, Calumet, and O'Brien plants.

¶ 26    The Act (415 ILCS 5/11 (West 2014)), incorporates Clean Water Act requirements into the Illinois NPDES permitting program.  NPDES permits must "contain those terms and conditions, including but not limited to schedules of compliance, which may be required to accomplish the purposes and provisions of this Act."  415 ILCS 5/39(b) (West 2014). Pursuant thereto, the Board has adopted regulations requiring the IEPA, when establishing the conditions of each issued NPDES permit, to "ensure" that the permit prevents discharges of pollutants that have the "reasonable potential" of violating any Illinois water quality standard, including State narrative criteria for water quality.  See 35 Ill. Adm. Code 304.105, amended at 38 Ill. Reg. 6107 (eff. Feb. 26, 2014), 309.141(d)(1), 309.143(a), amended at 39 Ill. Reg. 9433 (eff. June 26, 2015).    The IEPA must also "ensure" that NPDES permits are sufficiently stringent to comply with federal regulations (35 Ill. Adm. Code 309.141(d)(2) (2015)), one of which similarly requires that such permits prevent discharges of pollutants having the "reasonable potential" of violating a State water quality standard.  See 40 C.F.R. § 122.44(d)(1)(i) (2016).

¶ 27    Water quality standards have two primary components:  designated uses for a body of water (such as public water supply, recreation, or agriculture) and a set of criteria specifying the

maximum concentration of pollutants that may be present in the water without impairing its suitability for designated uses. *American Paper Institute, Inc. v. United States Environmental Protection Agency*, 996 F.2d 346, 349 (D.C. Cir. 1993). "Criteria, in turn, come in two varieties: specific numeric limitations on the concentration of a specific pollutant in the water (*e.g.*, no more than 0.05 milligrams of chromium per liter) or more general narrative statements applicable to a wide set of pollutants (*e.g.*, no toxic pollutants in toxic amounts)." *Id.*

¶ 28    The distinctive nature of each kind of criteria "inevitably leads to significant distinctions in how the two types of criteria are applied to derive effluent limitations in individual permits. When the standard includes numeric criteria, the process is fairly straightforward: the permit merely adopts a limitation on a point source's effluent discharge necessary to keep the concentration of a pollutant in a waterway at or below the numeric benchmark. Narrative criteria, however, present more difficult problems: How is a state or federal NPDES permit writer to divine what limitations on effluent discharges are necessary to assure that the waterway contains, for example, 'no toxics in toxic amounts'?" *Id.*

¶ 29    To address these difficulties, the EPA promulgated section 122.44 (d)(l)(vi) (40 C.F.R. § 122.44(d)(1)(vi) (2016)). "That rule requires NPDES permit writers to use one of three mechanisms to translate relevant narrative criteria into *chemical-specific* effluent limitations. Specifically, the regulation provides that a permit writer must establish effluent limits from narrative criteria by using (1) a calculated numeric water quality criterion derived from such tools as a proposed state numeric criterion or an 'explicit state policy or regulation interpreting its narrative water quality criterion'; (2) the EPA recommended numeric water quality criteria, but only on a 'case-by-case basis' and 'supplemented where necessary by other relevant information'; and/or (3) assuming certain conditions are met, limitations on the discharge of an 'indicator

parameter,' *i.e.*, a different pollutant also found in the point source's effluent." (Emphasis in original.) *American Paper*, 996 F.2d at 350.

¶ 30    In the present case, petitioners argue that the IEPA placed a 1.0 mg/L phosphorus effluent limit simply because that was the limit to which the District agreed, and that this limit was set without any analysis as to whether it was stringent enough to ensure that water quality standard violations would not occur.  Respondents counter that the Board has not yet developed *any* numeric limitations for phosphorus in Illinois rivers and streams and, as such, that the IEPA was not required to include a condition in the permits requiring phosphorus limits to ensure that the District meet a nonexistent numeric water quality standard.  Respondents argue that in the absence of any numeric water quality standards for phosphorus, the IEPA would have been justified in deciding not to impose any phosphorus effluent limit in the permits at all for the Stickney, Calumet, and O'Brien plants, and that petitioners have no cause to complain about the 1.0 mg/L phosphorus effluent limit provided for in the permits, which will reduce phosphorus discharge by almost 50%.

¶ 31    Although respondents are correct that the Board has not developed any numeric water quality standards for phosphorus, as discussed it *has* developed narrative statements calling for waters to be free from unnatural plant or algal growth.  See 35 Ill. Adm. Code 302.203, 302.403, amended at 39 Ill. Reg. 9388 (eff. July 1, 2015).

¶ 32    As discussed, to comply with such narrative statements, the IEPA may calculate a numeric water quality criterion derived from state numeric criterion or from the federal recommendation that "will attain and maintain applicable narrative water quality criteria and will fully protect the designated use."  40 C.F.R. § 122.44(d)(1)(vi)(A) (2016).  The IEPA here set a numeric phosphorus effluent limit of 1.0 mg/L, but there is no evidence that such a limit was

derived from any state or federal standards. To the contrary, petitioners presented scientific evidence from a study of phosphorus at the Egan plant (the Egan study) that levels of phosphorus should be lower than 0.05 mg/L to prevent the growth of excess levels of algae and plants in receiving and downstream waters. Petitioners also presented evidence that: the USEPA recommends a phosphorus water quality standard of 0.076 mg/L for Illinois's ecoregion;[1] Wisconsin's phosphorus water quality standard is 0.1 mg/L; and Minnesota's phosphorus water quality standard is 0.15 mg/L.

¶ 33    Such evidence that the IEPA's 1.0 mg/L phosphorus effluent limit is about 10 times the limit of out-of-state and federal standards raises a genuine issue of material fact regarding whether the 1.0 mg/L phosphorus effluent limit allowed by each of the permits at issue here allows for a level of phosphorus so high that it has the reasonable potential of violating Illinois water quality standards by causing unnatural plant or algal growth contrary to the Board's narrative standard.

¶ 34    Respondents argue that out-of-state numeric water quality standards, and the federal water quality recommendation are not binding in Illinois. While true, in the absence of any numeric water quality standards for phosphorus established by the Board, the out-of-state numeric water quality standards and the federal water quality recommendation are the type of data that may be used when determining the conditions of the permit that satisfy the narrative statements. *Id*. Such data show that the level of phosphorus allowed by the permits at issue here for the Stickney, Calumet, and O'Brien plants is approximately 10 times greater than that allowed in Wisconsin, Minnesota, or under the federal recommendation. Respondents point to

---

[1]    The EPA divides the nation into 14 ecoregions, based on landscape-level geographic features including climate, topography, regional geology and soils, biogeography, and broad land use patterns.

no type of testing or analysis performed by the IEPA that would explain or justify the 1.0 mg/L phosphorus effluent limit allowed by the permits here, or would explain why it does not more closely correspond to the Wisconsin and Minnesota limits or to the federal recommendation.

¶ 35    The data provided by petitioners regarding the out-of-state numeric water quality standards and the federal water quality recommendation, coupled with the data in the Egan study, raise a genuine issue of material fact regarding whether, to prevent unnatural plant or algal growth, the phosphorus level should be at the level set by the IEPA (1.0 mg/L) or closer to the lower levels set by Wisconsin, Minnesota, and the federal guideline.  If the 1.0 mg/L level is so high as to have the reasonable potential of causing unnatural plant or algal growth, then it is in violation of the narrative statements contained in the Board regulations calling for waters to be free from such growth.   Given this question of material fact, we reverse the order granting summary judgment in favor of respondents and remand for further proceedings.

¶ 36    Respondents argue, though, that we should affirm the summary judgment order in their favor because, in a responsiveness summary addressing comments it had received from the public, the IEPA stated that  its biologists have not observed the presence of any unnatural plant or algal growth in the waters downstream of the Stickney, Calumet and O'Brien plants; respondents argue that in the absence of any unnatural plant or algal growth in the downstream waters, there has been no violation of the narrative statements calling for waters to be free of such growth.

¶ 37    Respondents' argument is not well-taken.  The responsiveness summary does not indicate how regularly the IEPA biologists monitor the downstream waters, when they most recently monitored those waters, and whether the waters currently contain any unnatural plant or algal

growth in violation of the narrative statements. Given such questions of material fact regarding the biologists' findings, summary judgment is inappropriate.

¶ 38    Further, we note the applicable regulations require the IEPA, when establishing the conditions of the issued NPDES permit, to ensure that the permit prevents discharges of pollutants having the "reasonable potential" of violating Illinois water quality standards contained in the narrative statements. See 35 Ill. Adm. Code 304.105, amended at 38 Ill. Reg. 6107 (eff. Feb. 26, 2014), 309.141(d)(1), 309.143(a), amended at 39 Ill. Reg. 9433 (eff. June 26, 2015);  40 C.F.R. § 122.44(d)(1)(i) (2016).   Thus, the focal point of the analysis is not whether the waters *currently* contain unnatural plant or algal growth, but whether there is a *reasonable potential* that the phosphorus discharge allowed under the permits could cause such unnatural plant or algal growth in the future.  As discussed, a question of material fact exists regarding whether such a reasonable potential exists, and therefore summary judgment is inappropriate.

¶ 39    Respondents further argue we should affirm the summary judgment order in their favor because the permits at issue here contain a special condition mandating that the District's effluent cannot cause or contribute to water quality violations.   Respondents argue that such a special condition ensures the District's compliance with all applicable water quality standards. A similar argument was recently rejected in *Natural Resources Defense Council v. United States Environmental Protection Agency*, 808 F.3d 556 (2d Cir. 2015).   There, the USEPA issued a permit to regulate the discharge of ballast water from ships. *Id*. at 562.   The permit contained the following condition: "Your discharge must be controlled as necessary to meet applicable water quality standards in the receiving water body or another water body impacted by your discharges." *Id*. at 578.

¶ 40    The United States Court of Appeals held that this condition did not ensure compliance with water quality standards, as it was insufficient to give a shipowner guidance as to what was expected or to allow any permitting authority to determine whether a shipowner was violating water quality standards. *Id*.

¶ 41    Similarly, here, the special condition did not ensure compliance with water quality standards as it gave no guidance as to what was expected from the District, nor did it allow the IEPA to determine whether the District was violating water quality standards.

¶ 42    For the foregoing reasons, we reverse the order granting respondents' motion for summary judgment and denying petitioners' cross-motion for summary judgment, and remand for further proceedings.  As a result of our disposition of this case, we need not address the other arguments on appeal.

¶ 43    Reversed and remanded.