# Illinois Official Reports

## Appellate Court

---

*Alliance for the Great Lakes v. Department of Natural Resources,*
2020 IL App (1st) 182587

---

| | |
|---|---|
| Appellate Court Caption | ALLIANCE FOR THE GREAT LAKES, NATURAL RESOURCES DEFENSE COUNCIL, OPENLANDS, and SIERRA CLUB, Plaintiffs-Appellants, v. THE DEPARTMENT OF NATURAL RESOURCES; WAYNE A. ROSENTHAL, in His Official Capacity as Director of the Department of Natural Resources; and THE METROPOLITAN WATER RECLAMATION DISTRICT OF GREATER CHICAGO, Defendants-Appellees. |
| District & No. | First District, Fifth Division<br>No. 1-18-2587 |
| Filed | February 21, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 17-CH-05445; the Hon. Michael T. Mullen, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Mark N. Templeton and Robert A. Weinstock, of Abrams Environmental Law Clinic, of University of Chicago Law School (Sara Kinter, law student), and Elbert Ettinger, both of Chicago, for appellants. |

Kwame Raoul, Attorney General, of Chicago (Jane Elinor Notz, Solicitor General, and Christopher M.R. Turner, Assistant Attorney General, of counsel), for appellees Department of Natural Resources and Wayne A. Rosenthal.

Susan T. Morakalis, Ellen M. Avery, and Jorge T. Mihalopoulos, of Chicago, for other appellee.

Panel                    PRESIDING JUSTICE HOFFMAN delivered the judgment of the court, with opinion.
Justices Rochford and Delort concurred in the judgment and opinion.

## OPINION

¶ 1        The plaintiffs, the Alliance for the Great Lakes, the Natural Resources Defense Council, Openlands, and the Sierra Club, filed this action for administrative review of the final order of the Department of Natural Resources (Department), granting a petition by the Metropolitan Water Reclamation District of Greater Chicago (District) to modify its permit to divert water from Lake Michigan under the Level of Lake Michigan Act (Act) (615 ILCS 50/1 *et seq.* (West 2014)). On appeal, the plaintiffs, who were granted leave to intervene in the administrative proceedings, contend that the Department erred in the following two ways: (1) determining that the plaintiffs' evidence of other conservation practices and their related discovery requests were not applicable to permit modification proceedings and (2) finding that partial compliance with only one water quality standard constituted a "reasonably satisfactory sanitary condition" under the Act. For the reasons that follow, we affirm.

¶ 2        The following factual recitation and procedural history is derived from the pleadings and the administrative record.

¶ 3        Illinois diverts water from Lake Michigan pursuant to a consent decree imposed by the United State Supreme Court (Consent Decree). See *Wisconsin v. Illinois*, 388 U.S. 426 (1967). The Consent Decree limits the amount of water Illinois may divert to 3200 cubic-feet-per-second (cfs). *Id.* at 427-28. The Consent Decree specifically allows Illinois to divert water into the Chicago Area Waterway System (CAWS), which consists of the Chicago and Calumet rivers, in order "to maintain it in a reasonably satisfactory sanitary condition." *Id.* Illinois codified the terms of the Consent Decree in the Act, which designated the Department as the agency responsible for controlling and regulating the apportionment of diverted water from Lake Michigan. 615 ILCS 50/1.2 (West 2014).[1]

¶ 4        In addition to the Consent Decree and the Act, Illinois is also bound by the Great Lakes-St. Lawrence River Basin Water Resources Compact Act (Compact) (45 ILCS 147/5 (West 2014)), which codified an interstate agreement among the Great Lakes states and Ontario,

_____

[1]The Act originally designated that responsibility to the Illinois Department of Transportation (IDOT). For clarity, we also refer to IDOT as "the Department."

- 2 -

Canada. Relevant here, section 4.2 of the Compact requires that Illinois "develop and implement a [w]ater conservation and efficiency program, either voluntary or mandatory, within its jurisdiction based on the Party's goals and objectives." *Id.* ("Section 4.2. Water Conservation and Efficiency Programs."). The Compact also commits Illinois to promoting "Environmentally Sound and Economically Feasible Water Conservation Measures." *Id.* ("Section 4.2 Water Conservation and Efficiency Programs."). The Compact defines this as, *inter alia*, "measures, methods, technologies or practices for *** reducing a Withdrawal, Consumptive Use or Diversion." *Id.* ("Section 1.2. Definitions.").

¶ 5    The District operates publicly owned treatment works that assist Illinois in managing the direct diversion of water from Lake Michigan into the CAWS. The CAWS is primarily used for conveying treated municipal wastewater, commercial navigation, and flood control and, as a result, has low in-stream velocities. The CAWS is also subject to the overflow from the combined sewer system that serves the Chicago area. Theses combined sewer overflows (CSOs), which send untreated wastewater into the CAWS, are designed to occur at points along the waterway to avoid flooding streets or residences. When CSOs occur, the influx of untreated wastewater into the CAWS can lead to violations of the water quality standards set by the Illinois Pollution Control Board (PCB) and enforced by the Illinois Environmental Protection Agency (IEPA). Particularly, CSOs have been a main contributor to depressed dissolved oxygen (DO) levels in the CAWS. As such, the District uses diverted water from Lake Michigan to increase the water flow, dilute the polluted water, and help the CAWS meet water quality standards.

¶ 6    Pursuant to the Act, the Department's apportionment of diverted water is accomplished through a permit program set forth in the Department's administrative rules (Rules) (17 Ill. Adm. Code 3730.301 *et seq.* (2014)), which were adopted in 1980. See 615 ILCS 50/3 (West 2014) ("The Department *** shall devise and develop a continuing program for the apportionment of water to be diverted from Lake Michigan *** for domestic purposes or for direct diversion into the [CAWS] to maintain [it] in a reasonably satisfactory sanitary condition ***.").

¶ 7    Relevant here are Rules 304, 307, and 310. Rule 304—entitled "Water Needs Criteria"—requires that the Department determine the "anticipated water needs for each applicant," and instructs the Department, when making that determination, to consider, *inter alia*, the "implementation of conservation practices." 17 Ill. Adm. Code 3730.304 (2014). Subsections (a) and (b) list the conservation practices that the Department must consider for "applicants" of each water user category. *Id.* § 3730.304(a), (b). Rule 307(a)—entitled "Conservation Practices and Other Permit Conditions"—requires that the Department "condition allocations within a user category upon required conservation practices for each user category as specified in subsections (b) and (c)." *Id.* § 3730.307(a). Subsection (c) mandates that the Department "require evidence of adoptions by the permittee of the following conservation practices as applicable to the particular user" and lists 10 such practices. *Id.* § 3730.307(c). Rule 310—entitled "Petitions for Modification"—allows for "[p]etitions for modification of an allocation permit" to be filed by a water user at any time. *Id.* § 3730.310(a). Subsection (b) lists the grounds for modification, which include a "substantial change in circumstances that results in a change in water needs of the entity" and changes to "standards affecting the water quality of the [CAWS]." *Id.* § 3730.310(b).

¶ 8    The Department initially granted the District permission to divert water from 1977 to 1980. Following the 1980 adoption of the Rules, the District was granted a 40-year permit to divert water in 1981. The District's allotment of diverted water has been closely tied to the completion of its Tunnel and Reservoir Plan (TARP), which began construction in 1975 and, once completed, will consist of 109 miles of storm water tunnels and three reservoirs. Completing TARP is expected to reduce pollution in the CAWS by limiting CSOs and, therefore, reduce the District's need for future diversionary water. As a result, the District's 1980 permit allocated 320 cfs of water, which was set to reduce to 101 cfs when TARP was completed in 2001. However, TARP was not completed on time, and in 2000, the District requested that the Department modify the permit to delay the reduction in its allocated water until 2014, the new completion date for TARP. The Department granted the District's request to modify its permit, increasing its allocation amount to 270 cfs beginning in 2001, which would then reduce to 101 cfs beginning in 2015.

¶ 9    On July 7, 2014, the District filed the instant petition with the Department, pursuant to Rule 310 (*id.* § 3730.310), seeking to modify its permit to delay the reduction of its allocated water scheduled for 2015. The District provided the following four substantial changes in circumstances that supported modification of its petition: (1) TARP's completion date was delayed from 2014 to 2029, (2) the Department received notification from the IEPA that regulatory standards affecting the water quality of the CAWS had been changed, (3) modeling forecasts showed that reducing the District's diversion as planned would result in exceeding water quality standards, and (4) previous modeling had significantly underestimated the amount of diversion required to meet water quality standards. The District requested that the Department modify the permit to maintain diversion at 270 cfs until TARP is completed in 2029.

¶ 10    The plaintiffs, the IEPA, and the Illinois Attorney General's Office all sought to intervene in the proceedings. On December 12, 2014, the hearing officer granted their motions "[b]ased upon no objection by [the District]." The plaintiffs sought discovery from the District regarding specific conservation practices, and the District objected. Following a prehearing conference, the hearing officer granted the plaintiffs leave to file a motion to compel discovery and ordered them to file a statement of contested issues. The plaintiffs complied and filed a list of 12 contested issues.

¶ 11    After briefing by the parties, the hearing officer determined that 10 of the plaintiffs' 12 contested issues were not appropriately available to be contested in the proceeding. Relevant here, the hearing officer noted that eight of the plaintiffs' contested issues "suggest investigating and presumably requiring different actions to reduce the need for the requested diversion increase," which the plaintiffs argued was required by Rule 304 and section 5 of the Act. The proposed actions the plaintiffs sought included the same conservation practices referenced in their discovery requests. The hearing officer concluded that both Rule 304 and section 5 of the Act, by their plain language, apply only to new permit applications, not permit modifications, and that Rule 310 provides the procedural and substantive requirements governing permit modifications. In support, the hearing officer noted that Rule 304 and section 5 both used the terms "applicants" and "applications," whereas Rule 310 used the term "permits." The hearing officer further noted that Rule 310, which explicitly incorporates the Rules outlining the procedural requirements for permit applications, does not similarly incorporate any of the substantive application requirements, such as Rule 304. Additionally,

- 4 -

the hearing officer noted that the District's 2000 permit modification stated that "[i]f circumstances such as [delay in] the completion of TARP or problems with significant exceedances of water quality standards occur, a proceeding for modification may need to occur." The hearing officer interpreted this provision as allowing for a delay in the District's reduction to 101 cfs should the assumptions regarding TARP's completion prove incorrect. As a result of this language, the hearing officer "decline[d] to regulate in a manner that would negatively impact legitimate reliance by a permittee on the conditions of a Department permit." The hearing officer, therefore, concluded that the plaintiffs' contested issues regarding specific conservation practices were not "appropriately available to be contested" in the proceeding. Based on this determination, the hearing officer also denied the plaintiffs' motion to compel discovery regarding those same conservation practices.

¶ 12 The parties submitted position statements, and the plaintiffs also submitted a prehearing memorandum. The District filed written testimony of three witnesses, the plaintiffs filed written testimony of four witnesses, the IEPA and the Department each filed the written testimony of one witness. The four witnesses for the plaintiffs submitted written testimony recommending the study and implementation of the same conservation measures outlined in their contested issues. The District filed a motion to quash the plaintiffs' prehearing memorandum and to strike the written testimony of the plaintiffs' witnesses. On September 25, 2015, the hearing officer denied the District's motion and admitted the plaintiff's prehearing memorandum and the written testimony of their witnesses for the limited purpose of an offer of proof regarding the prior determination that the plaintiffs' contested issues were not appropriately available to be contested in the proceeding.

¶ 13 The hearing took place on October 6 and 7, 2015. Five witnesses—Dr. Charles Melching (the District), Jennifer Wasik (the District), Edward Saudacher (the District), Daniel Injerd (the Department), and Scott Twait (IEPA)—testified in person, only for the purposes of cross-examination. All five witnesses offered testimony in support of the District's petition for modification. The plaintiffs did not present any witnesses for live testimony, but they did cross-examine witnesses.

¶ 14 Dr. Charles Melching testified that, at the District's request, he created a computer model demonstrating that a reduction from 270 cfs to 101 cfs, prior to the completion of certain segments of TARP, would result in a nearly 30% drop in system-wide compliance with PCB's DO standards for the CAWS. Dr. Melching testified that the DO regulatory standard has historically been used by the Department as the primary indicator for water quality in the CAWS. According to Dr. Melching's model, a reduction from 270 cfs to 101 cfs would result in system-wide compliance falling from its current 95.8% to 66.8%.

¶ 15 Injerd, the Department's director of water resources, testified that the Department agreed with using the PCB's DO standard because it is the "best indicator of water quality to evaluate the need for and quantity of discretionary diversion water." He further testified that the Department supported an allocation amount that maintained the CAWS at its current compliance rate as to the DO standard. Injerd stated that the Department supported the District's intention to develop guidance for the "optimal use of Discretionary Diversion" and recommended that "this project be included as a condition" in the District's modified petition. Injerd testified that the Department supported a diversion amount of 270 cfs from 2015 to 2017, at which time the amount would reduce to 220 cfs until 2030.

¶ 16    Twait, an engineer in the water quality standards section of the IEPA, similarly testified that the IEPA supported increasing the District's allocation of water to 270 cfs because that "will maintain the highest frequency of compliance with [DO] standards." Twait further testified that the IEPA supported using the DO standard for determining "compliance here."

¶ 17    On September 22, 2016, the Department issued an order granting the District's petition to modify its allocation amount. In the written order, the Department first determined that the District had established, pursuant to Rule 310(b) (*id.* § 3730.310(b)), a substantial change in circumstances that supported a modification of its allocated water amount. Specifically, the Department noted the delay in completing TARP, the forthcoming changes to the PCB's DO standard for the CAWS, and Dr. Melching's modeling that showed a failure to increase the water amount would result in exceedances of water quality standards. Having so concluded, the Department then addressed the appropriate modified diversion amounts and the permit terms and conditions.

¶ 18    The Department concluded that the PCB's DO standard was the best indicator of water quality for the purposes of evaluating the need for, and quantity of, discretionary diversion water. The Department noted that the District, the IEPA, and its own employee supported using the DO regulatory standard to assess water quality in the CAWS and also supported an allocation amount that maintained the current compliance rate at the time of the proceeding, which was 95%. The Department further noted that the plaintiffs made no objections to any of the witnesses' " qualifications or ability to render an opinion on this issue," nor did the plaintiffs offer any "witness testimony providing the substance of an alternate position." Accordingly, the Department determined that compliance with DO regulatory standards at a 95% compliance rate was an appropriate standard for determining the water amount necessary "for purposes of this proceeding."

¶ 19    Lastly, the Department addressed what, if any, conservation practices should be required of the District as a condition of their permit modification. The Department concluded that Rule 307 exclusively governed this issue. The Department noted that, in its first water allocation decision after promulgating the Rules, it stated that Rule 307's predecessor was the Department's response to section 5's mandate that "all feasible means reasonably available *** shall be employed to conserve and manage the water resources of the region." 615 ILCS 50/5 (West 2014). After reviewing the history of the Act and the Rules, the Department found that its consistent interpretation has been that the Rules codified the "Permit Condition Approach" when requiring conservation practices. The Department explained that, under this approach, each permit, whether an initial application or a permit modification, must impose as a condition only the conservation practices specified in Rule 307. In support, the Department noted that, in its first water allocation decision after the Rules were promulgated, the permit order contained only a provision requiring that "[e]ach permittee *** shall comply with the requirements of [Rule 307]." The Department highlighted the success of this longstanding approach to conservation by noting that the Department had already achieved a reduction in the District's allocation of water from 320 cfs to 270 cfs. The Department further noted that the record established the District is already implementing several conservation practices that will help reduce its need for diverted water. Accordingly, the Department included the following language in the District's modified permit: "[The District] will complete all water conservation practices mandated by [Rule 307]."

¶ 20     In so holding, the Department incorporated the hearing officer's interpretation of Rules 304 and 310 and rejected the plaintiffs' argument that the Act and the Rules require that it conduct a Rule 304 water needs analysis and make a case by case determination of what conservation practices to require as a condition of water allocation. The Department concluded that Rule 310, which governs modifications to an existing permit, by its plain language, "focuses on the basis for modification," such as "changes in circumstances and changes in information to that originally submitted in a permittee's application for permit," and on "the appropriate modification as a result of said basis." As such, Rule 310 does not require the Department to replicate the substantive requirements of the permit application process, such as a Rule 304 water needs analysis.

¶ 21     Ultimately, the Department ordered the District's petition modified to reflect the following allocation amounts: 270 cfs through 2017, 220 cfs through 2030, 101 cfs from 2031 to 2035.

¶ 22     The plaintiffs filed a motion to reconsider the Department's decision, arguing, *inter alia*, that the Department failed to address their argument that the Compact imposed distinct legal requirements in addition to the Act and was, therefore, applicable to the permit modification proceeding.

¶ 23     On March 14, 2017, the Department issued a written order, denying the plaintiffs' motion to reconsider. Relevant here, the Department agreed that section 4.2 of the Compact was relevant to the modification proceeding. However, the Department emphasized that the plain language of section 4.2 "only makes a water conservation program applicable to Illinois's Lake Michigan water use" and, thus, there was no requirement to "specifically cite or mention the Compact" during the proceeding. Moreover, the Department concluded that "[t]he Department's legally binding regulatory program set forth in [the Rules] clearly meets" the Compact's requirement that Illinois create a voluntary or mandatory water conservation program. Accordingly, the Director denied the plaintiffs' motion to reconsider.

¶ 24     On April 14, 2017, the plaintiffs filed a complaint for administrative review in the circuit court of Cook County, naming the District, the Department, and the Department's Director, Wayne A. Rosenthal, as the defendants. The plaintiffs' four-count complaint alleged the following: (1) the Department violated state and federal law by failing to meet its obligations under the Compact, (2) the Department misinterpreted Rule 304 as being inapplicable to petition modification proceedings, (3) the Department misinterpreted Rule 307 when it determined that it need not condition the District's permit to require the implementation of specific conservation practices, and (4) the Department misinterpreted the Act and the Rules in determining that "reasonably satisfactory sanitary condition" and "water quality standards" are satisfied by partial compliance with DO regulatory standards.

¶ 25     On October 5, 2017, the District filed a combined motion to dismiss the plaintiffs' complaint pursuant to section 2-619.1 of the Code of Civil Procedure (Code) (735 ILCS 5/2-619.1 (West 2016)). The District argued that, pursuant to section 2-619(a)(9) of the Code, the plaintiffs lacked standing to appeal the Department's modification of the District's permit. The District also argued that the plaintiffs' complaint should be dismissed pursuant to section 2-615 of the Code for failing to allege sufficient facts to establish their standing.

¶ 26     On January 8, 2018, the circuit court granted, without prejudice, the District's motion to dismiss pursuant to section 2-615 of the Code and denied, as moot, the District's motion to dismiss pursuant to section 2-619 of the Code.

¶ 27    On February 5, 2018, the plaintiffs filed an amended complaint, which included a section that addressed their standing. The District and the Department adopted the administrative record as their answer to the plaintiffs' amended complaint.

¶ 28    The plaintiffs, the District, and the Department each filed cross-motions for summary judgment. The District and the Department both argued that the Department correctly interpreted the Rules when it granted the District's petition to modify its permit. The District also renewed their argument that the plaintiffs lacked standing to bring their claims. On November 13, 2018, the circuit court, in an oral pronouncement, denied the plaintiffs' motion for summary judgment, denied the District's motion for summary judgment as to the standing issue, and granted summary judgment in favor of the District and the Department on all four of the plaintiffs' claims. This appeal followed.

¶ 29    On appeal, the plaintiffs argue that the Department erred in the following two ways: (1) determining that the plaintiffs' evidence of other conservation practices and their related discovery requests were not applicable to permit modification proceedings and (2) finding that partial compliance with the DO standard constituted a "reasonably satisfactory sanitary condition."

¶ 30    At the outset, we must first address the District's argument that the plaintiffs lack standing to bring this appeal.

¶ 31    To begin, we note that the District did not raise the standing argument before the Department when the plaintiffs sought to intervene. According to the December 12, 2014 order, the hearing officer allowed the plaintiffs to intervene "[b]ased upon no objection by the [District]." In Illinois, lack of standing is an affirmative defense and will be waived if not raised in a timely fashion. *Greer v. Illinois Housing Development Authority*, 122 Ill. 2d 462, 508 (1988). Therefore, the District has arguably forfeited review of this issue. Forfeiture aside, we nevertheless conclude that the plaintiffs do have standing to bring this action.

¶ 32    Standing requires an "injury in fact," whether actual or threatened, that is "(1) distinct and palpable; (2) fairly traceable to the defendant's actions; and (3) substantially likely to be prevented or redressed by the grant of the requested relief." *Glisson v. City of Marion*, 188 Ill. 2d 211, 221 (1999). A distinct and palpable injury refers to an injury that cannot be characterized as "a generalized grievance common to all members of the public." *Greer*, 122 Ill. 2d at 494. However, article XI of the Illinois Constitution broadens the law of standing by eliminating the traditional special injury requirement in an environmental action. Ill. Const. 1970, art. XI, §§ 1-2; see *Glisson*, 188 Ill. 2d at 228. In Illinois, "[t]he doctrine of standing is designed to preclude persons having no interest in a controversy from bringing suit, but it should not be an obstacle to the litigation of a valid claim." *People v. $1,124,905 U.S. Currency & One Chevrolet Astro Van*, 177 Ill. 2d 314, 330 (1997). To that end, our supreme court has recognized that Illinois standing law is more liberal than federal law and that "State courts are generally more willing than Federal courts to recognize standing on the part of any plaintiff who shows that he is in fact aggrieved by an administrative decision." *Greer*, 122 Ill. 2d at 491.

¶ 33    The plaintiffs argue that they have met the standing requirements because either they, or their members, own shorefront property on Lake Michigan and use and enjoy both the CAWS and Lake Michigan. They argue that these interests are harmed by the Department's decision to modify the District's permit to increase its water allocation in the followings ways: (1) increasing water diversion into the CAWS by an additional 420 billion gallons impacts the

water level in Lake Michigan, which diminishes the value of lakefront property and the ability to recreate in Lake Michigan; (2) an increase in water diversions into the CAWS also increases the likelihood of an invasive species transfer, such as Asian Carp; and (3) an ineffective program to maintain water quality in the CAWS impacts the plaintiffs' members' ability to recreate in the CAWS. We agree.

¶ 34    Put simply, the District sought to increase its allocation of water from Lake Michigan by approximately 420 billion gallons for the purposes of maintaining water quality in the CAWS. The plaintiffs alleged sufficient facts to establish that such an increase would injure their members by lowering water levels in Lake Michigan, increasing the likelihood of invasive species migrating into Lake Michigan, and failing to address unsanitary conditions in the CAWS. The plaintiffs further alleged that these harms could have been redressed if the Department had required that the District implement the plaintiffs' specific conservation practices as a condition of their allocation because these practices would reduce CSO events and, therefore, reduce the need for diverted water. Moreover, the Department allowed the plaintiffs to intervene below, without the District objecting, and afforded it the chance to cross-examine witnesses, submit evidence, and make applications for reconsideration. "[T]o allow an intervenor the status of party and to accord it all the panoplies of the adversary process but to deny it the statutory right of appeal requires a great leap of the imagination to satisfy the fundamentals of simple fairness." *Illinois Telephone Ass'n v. Illinois Commerce Comm'n*, 67 Ill. 2d 15, 23 (1977). Accordingly, we conclude that the plaintiffs have alleged sufficient facts to establish that they have standing to prosecute this appeal.

¶ 35    Turning to the merits, the plaintiffs first contend that the Department erred when it determined that their evidence of specific conservation practices was not relevant to the District's permit modification proceeding. The plaintiffs contend that their evidence was relevant for the purposes of determining the District's anticipated water needs pursuant to Rule 304 and for drafting the appropriate conditions for the District's permit pursuant to Rule 307. Essentially, the plaintiffs argue that the Department interpreted these Rules in such a way that contravenes the plain language of the Rules, the Act, and the Compact. The plaintiffs further contend that, due to the Department's erroneous interpretation of their Rules, it also abused its discretion when it denied the plaintiffs' discovery requests and limited their ability to introduce evidence.

¶ 36    In administrative review cases, we review the decision of the administrative agency, not the decision of the circuit court. *Exelon Corp. v. Department of Revenue*, 234 Ill. 2d 266, 272 (2009). "[T]he applicable standard of review depends upon whether the question presented is one of fact, one of law, or a mixed question of fact and law." (Internal quotation marks omitted.) *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 210 (2008).

¶ 37    The proper construction of a statute and the regulations thereunder are questions of law reviewed *de novo*. *People ex rel. Madigan v. Illinois Commerce Comm'n*, 231 Ill. 2d 370, 380 (2008). "In construing regulations promulgated by an administrative agency, the same rules used to interpret statutes apply." *LaBelle v. State Employees Retirement System of Illinois*, 265 Ill. App. 3d 733, 736 (1994). "One of the primary rules of statutory construction is that the court should first consider the language of the provision at issue, and, where that language is clear, it should be given effect without resorting to other aids for construction." *Id.* That said, an agency's interpretation of an ambiguous provision in its enabling statute or its regulations

is entitled to "substantial weight and deference" as an informed source based upon its "experience and expertise" to ascertain legislative and regulatory intent. *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 98 (1992).

¶ 38    An administrative agency's decision "regarding the conduct of its hearing and the introduction of evidence is properly governed by an abuse of discretion standard." *Wilson v. Department of Professional Regulation*, 344 Ill. App. 3d 897, 907 (2003). "An abuse of discretion occurs when no reasonable person would take the view adopted by the court." *Trettenero v. Police Pension Fund*, 333 Ill. App. 3d 792, 801 (2002).

¶ 39    We turn first to the Department's interpretation of Rule 304, which is entitled "Water Needs Criteria" and states as follows:

> "The Department will determine anticipated water needs for each applicant. The Department will take into consideration in making that determination the population of the area to be served, projected population growth, current and projected per capita consumption within the area, the nature and extent of industrial uses ***, municipal and hydrant uses ***, implementation of conservation practices, and the reduction of non-revenue water as required by this Section." 17 Ill. Adm. Code 3730.304 (2014).

The Rule goes on to list the conservation practices that "will be considered with respect to applicants" in each of the specific user categories. *Id.* Rule 304(b) states that, for users such as the District, the "[c]onservation practices that will be considered" include

> "improved and more accurate measurement and accounting procedures, improved treatment of all wastewater flows, elimination of untreated combined sewer bypass flows, reasonable use of aeration facilities, implementation of navigational and storm response operations, and procedures to minimize Lake Michigan diversion and implementation of effective programs of leak prevention, detection and correction." *Id.* § 3730.304(b).

¶ 40    The plaintiffs contend that Rule 304's water needs analysis is applicable to each allocation of water, not just for new diversion applicants. As such, the plaintiffs argue that the Department was required to consider evidence of the specific conservation practices listed in Rule 304(b) relevant to a user such as the District. The Department responds that Rule 304 is only applicable to initial permit applications, not modifications of existing permits. The Department maintains that Rule 310, and the Rules incorporated therein, is the only provision applicable to determining whether to modify an existing user's permit, and Rule 310 does not incorporate Rule 304.

¶ 41    By its plain language, Rule 304 requires the Department to determine the water needs of "each applicant," which supports the Department's interpretation that Rule 304 is only applicable to an initial application for diverted water. However, as the plaintiffs correctly point out, Rule 304(a) also refers to "permittee[s]" and "users," which arguably supports their interpretation that Rule 304 is applicable to all allocations of water. Therefore, the Rules are, at best, ambiguous regarding whether Rule 304 is applicable to modifications of an existing permit. As mentioned, an agency's interpretation of an ambiguous provision in its enabling statute or its regulations is entitled to "substantial weight and deference" as an informed source based upon its "experience and expertise" to ascertain legislative and regulatory intent. *Abrahamson*, 153 Ill. 2d at 98. Consequently, we conclude that the Department did not err in interpreting Rule 304's water needs analysis as applying only to initial applications, not to permit modifications.

¶ 42    The plaintiffs further contend that, if Rule 304 is read as being inapplicable to modifying exiting permits, then Rule 304(b), which outlines the conservation practices to be considered when determining the anticipated water needs of diversion water users, such as the District, is superfluous. *Bonaguro v. County Officers Electoral Board*, 158 Ill. 2d 391, 397 (1994) ("Statutes should be construed, if possible, so that no term is rendered superfluous or meaningless."). At the center of the plaintiffs' argument is that, since the District is the only entity that meets the definition of a diversionary user under Rule 303, and its permit predates the adoption of the Rules, then no diversion water user will ever be subject to a water needs analysis under Rule 304(b). The Department responds that the plaintiffs' argument fails because it assumes that there will never be another entity tasked with managing the diversion of water into the CAWS. We agree with the Department. Although the District is the only entity that currently falls within that category, this does not preclude a future entity from taking on those responsibilities and applying for a new allocation. Therefore, nothing about the Department's interpretation renders Rule 304(b) superfluous.

¶ 43    The plaintiffs nevertheless contend that Rule 310 also supports its reading of Rule 304. Rule 310, which is titled "Petitions for Modification," states that

> "[p]etitions for modification of an allocation permit may be filed by any entity at any time. *** If the Department finds that any such petition is supported by an adequate statement of reasons, is not plainly devoid of merit or frivolous, and does not deal with a subject on which a hearing has been held within the preceding six months, a hearing shall be held pursuant to Sections 3730.201 through 3730.215." 17 Ill. Adm. Code 3730.310(a) (2014).

Rule 310(b) then lists four possible bases for modifying an allocation permit, one of which is "[e]vidence of a substantial change in circumstances that results in a change in water needs of the entity." *Id.* § 3730.310(b)(1).

¶ 44    The plaintiffs maintain that the reference to "change in water needs" contemplates a full water needs analysis pursuant to Rule 304. The Department responds that nothing in Rule 310 explicitly incorporates the substantive requirements of Rule 304. We agree with the Department. Although Rule 310 does use the phrase "water needs," the Rule does not incorporate or refer to Rule 304. In its other provisions, Rule 310 explicitly incorporates the procedural and substantive provisions relevant to permit applications that it wishes to duplicate during the permit modification process. *Id.* § 3730.310(a) ("Petitions for modification must comply with Section 3730.204(c). *** [A] hearing shall be held pursuant to Sections 3730.201 through 3730.215."). We, therefore, conclude that the Department did not err in determining that Rule 310 did not require a water needs analysis pursuant to Rule 304.

¶ 45    The plaintiffs next contend that the Department's interpretation of Rule 304 contravenes the text and purpose of the Act. In support, the plaintiffs refer to the following language contained in section 5 of the Act:

> "The Department in determining each allocation of water under this Act shall consider the water requirements of the Northeastern Illinois Metropolitan Region ***; the Department shall be guided by population, business and economic projections and requirements. The Department shall require that all feasible means reasonably available *** shall be employed to conserve and manage the water resources of the region and the use of water therein in accordance with the best modern scientific knowledge and engineering practice." 615 ILCS 50/5 (West 2014).

The plaintiffs' argument rests on the phrases "each allocation of water under this Act" and "all feasible means reasonably available *** to conserve and manage the water resources," which they contend requires the Department to conduct a full water needs analysis for both new applications and permit modifications. See *id.* The Department responds that section 5 does not mandate that the Department consider conservation practices when determining "each allocation of water." *Id.* Rather, section 5's sole reference to conserving water occurs in a separate sentence and directs only that the Department "require" all feasible and reasonably available means to conserve and manage water. *Id.* The Department, therefore, maintains that nothing in section 5 supports the plaintiffs' argument that the Act requires the Department to consider a permittee's water conservation practices to determine its modified water allocation. We agree with the Department.

¶ 46    By its plain language, section 5 states what the Department must consider when determining "each allocation of water" and conservation practices are not listed. Section 5's mandate that the Department require "all feasible means reasonably available" be "employed to conserve and manage the water resources of the region" is a separate command from a separate sentence. Accordingly, the Department's interpretation of Rule 304 does not contravene the text of the Act because section 5 does not require the Department to consider conservation practices when determining "each allocation of water."

¶ 47    The plaintiffs also contend that the Department's interpretation of Rule 304 contravenes the purposes of the Compact, which they argue imposes obligations on Illinois to consider alternative conservation measures when determining a user's water needs. Section 4.2 of the Compact requires that Illinois "develop and implement a [w]ater conservation and efficiency program, either voluntary or mandatory, within its jurisdiction based on the Party's goals and objectives." 45 ILCS 147/5 (West 2014) ("Section 4.2. Water Conservation and Efficiency Programs."). The Compact also commits Illinois to promoting "Environmentally Sound and Economically Feasible Water Conservation Measures." *Id.* ("Section 4.2. Water Conservation and Efficiency Programs."). Section 1.2 of the Compact defines "Environmentally Sound and Economically Feasible Water Conservation Measures" as

> "those measures, methods, technologies or practices for efficient water use and for reduction of water loss and waste or for reducing a Withdrawal, Consumptive Use or Diversion that (i) are environmentally sound, (ii) reflect best practices applicable to the water use sector, (iii) are technically feasible and available, (iv) are economically feasible and cost effective based on an analysis that considers direct and avoided economic and environmental costs and (v) consider the particular facilities and processes involved, taking into account the environmental impact, age of equipment and facilities involved, the processes employed, energy impacts and other appropriate factors." *Id.* ("Section 1.2. Definitions.").

¶ 48    The plaintiffs cite to the provision in the Compact that commits Illinois to promoting "measures, methods, technologies or practices for *** reducing a Withdrawal, Consumptive Use or Diversion" as support for its contention that the Department's interpretation of Rule 304 contravenes the purpose of the Compact. *Id.* ("Section 1.2. Definitions.") The Department responds that the Rules do satisfy Illinois's obligations under the Compact because the Rules require a consideration of conservation practices when determining each application for diverted water and each permit features a condition requiring the permittee to implement certain conservation practices. We agree with the Department.

¶ 49 Put simply, the Compact commits Illinois to promoting general conservation practices, which Illinois does through the Department and its Rules. The Compact does not speak, however, to how Illinois should approach determining allocations for new applicants as opposed to existing permittees. As such, the Department's interpretation of Rule 304 does not contravene any provisions of the Compact, and the plaintiffs' argument is, therefore, unavailing.

¶ 50 The plaintiffs' final contention in support of their Rule 304 interpretation is that a Department employee made comments during the 2014 rule amendment process that suggested the Department would consider the conservation practices listed in Rule 304 during a future modification hearing. The plaintiffs offer no authority to support their position that comments made by an agency employee during rulemaking constitutes a persuasive aid to interpret an agency's regulation. To the contrary, when confronted with an ambiguous rule or statute, we defer to an agency's interpretation of its regulations made in formal proceedings, not to the views otherwise expressed by its staff. See *McHenry County Defenders, Inc. v. City of Harvard*, 384 Ill. App. 3d 265, 279 (2008) (finding that deference to an administrative agency's interpretation occurs "in the context of specific administrative decisions [citation] and is not based on one employee's deposition testimony"). We will not depart from that practice here.

¶ 51 Accordingly, we conclude that the Department did not err when it determined that it need not consider the conservation practices listed in Rule 304 during proceedings to modify an existing permit. The language in Rule 304 is, at best, ambiguous, and we therefore defer to the reasonable interpretation of the Department. *Abrahamson*, 153 Ill. 2d at 98.

¶ 52 We turn next to the Department's interpretation of Rule 307. Rule 307—titled "Conservation Practices and Other Permit Conditions"—states that

> "[t]he Department shall condition allocations within a user category upon required conservation practices for each user category as specified in subsections (b) and (c). Failure by any permittee to meet the conservation requirements applicable to it within a reasonable period of time will, upon notice, hearing and determination of the failure, constitutes a violation of a Department order." 17 Ill. Adm. Code 3730.307(a) (2014).

While subsection (b) is not relevant here, subsection (c) states that "[t]he Department shall require evidence of adoptions by the permittee of the following conservation practices as applicable to the particular user" and lists 10 specific conservation practices. *Id.* § 3730.307(c). The parties agree that one of those 10 conservation practices—Rule 307(c)(10)—is applicable to the District, and it requires "[i]nstallation *** and implementation of programs to reduce to a reasonable minimum, and to accurately account for, water used for navigational and discretionary *** purposes." *Id.* § 3730.307(c)(10). The Department interpreted Rule 307 as providing the exclusive list of conservation practices that it could require a permittee to adopt as a condition of their permit. As a result, the Department determined that it need not consider the plaintiffs' proffered conservation practices and ordered the District to "complete all water conservation practices mandated by [Rule] 307."

¶ 53 The plaintiffs challenge both the Department's determination that Rule 307 provides the exclusive list of conservation practices that the Department can require of a permittee and their determination that a general condition requiring compliance with Rule 307 is sufficient. Specifically, the plaintiffs argue that the phrase "as applicable to the particular user" in Rule 307(c) would be superfluous under the Department's interpretation. The Department responds that the phrase "as applicable to the particular user" in subsection (c) is not superfluous but

merely acknowledges that not all of the 10 listed conservation practices are applicable to all possible category of users and that only those conservation practices applicable to a particular category of user are required.

¶ 54    By its plain language, subsection (a) mandates only that the Department impose permit conditions that require the conservation practices "for each user category" specified in subsections (b) and (c). Nothing in the Rules allows the Department to impose conditions on permits requiring conservation practices not listed in subsections (b) or (c). Consequently, the Department did not err when it determined that Rule 307 provided the exclusive list of conservation practices that it could require as a condition in the District's modified permit.

¶ 55    Moreover, the Department's interpretation does not render any part of Rule 307 superfluous. Subsection (a) states that only the "conservation practices for each user category" are required, reflecting the fact that not all the conservation practices listed in subsection (b) and (c) are applicable to all categories of users. For instance, five of the listed practices in subsection (c) are applicable only to users who have the ability to pass ordinances, such as Rule 307(c)(5), which requires "[t]he adoption of ordinances requiring the installation of closed system air conditioning in all new construction and in all remodeling." *Id.* § 3730.307(c)(5). Thus, the phrase "conservation practices as applicable to the particular user" in subsection (c) is not superfluous, as the plaintiffs suggest, because only some of the 10 practices listed in that subsection will be applicable to a given user. As such, that phrase is included to reflect the fact that only the applicable conservation practices are required.

¶ 56    As they did with Rule 304, the plaintiffs also argue that the Department's interpretation of Rule 307 contravenes the Act, citing once more to section 5's mandate that "[t]he Department shall require that all feasible means reasonably available *** shall be employed to conserve and manage the water resources of the region and the use of water therein in accordance with the best modern scientific knowledge and engineering practice." 615 ILCS 50/5 (West 2014). According to the plaintiffs, the phrases "all feasible means reasonably available" and "in accordance with the best scientific knowledge and engineering practice" require that the Department review all available conservation measures and tailor the required conservation measures to each specific user's needs. The Department responds that section 5 does not provide the substantive standards to determine when conservation practices are "feasible" or "reasonably available," nor does it provide guidance on what procedures should be used to require such practices, and as such, the Act grants the Department discretion to formulate the rules and procedures to implement these mandates. The Department further responds that requiring each permittee to comply with the specific conservation practices applicable under Rule 307 fulfills its obligations under section 5 of the Act. We agree with the Department.

¶ 57    Section 5 does not instruct the Department on how to determine when conservation practices are "feasible" or "reasonably available." Instead, the General Assembly left that task to the Department, which promulgated Rule 307 in response to section 5's mandate. *Church v. State*, 164 Ill. 2d 153, 161-62 (1995) ("Where the legislature expressly or implicitly delegates to an agency the authority to clarify and define a specific statutory provision, administrative interpretations of such statutory provisions should be given substantial weight unless they are arbitrary, capricious, or manifestly contrary to the statute."). As mentioned, Rule 307 requires that each permit application contain a condition requiring the permittee to implement specific conservation practices applicable to its user category. As the Department noted, this approach to water conservation has resulted in a considerable reduction in the amount of diverted water

the District uses for maintaining water quality in the CAWS. Moreover, we note that the Department's determination that Rule 307 satisfied its obligations under section 5 of the Act is long held, having been first articulated in 1980 when the Rules were first promulgated. See *Illinois Bell Telephone Co. v. Illinois Commerce Comm'n*, 362 Ill. App. 3d 652, 657 (2005) ("The longer an agency has adhered to an interpretation of the statute, the more weight the interpretation deserves ***."). Consequently, we conclude that the Department's reasonable interpretation of Rule 307 does not contravene the Act.

¶ 58    The plaintiffs also cite to *Prairie Rivers Network v. Illinois Pollution Control Board*, 2016 IL App (1st) 150971, in support of their argument that the Department's interpretation of Rule 307 is legally insufficient. In *Prairie Rivers*, we held that a National Pollution Discharge Elimination System permit did not comply with the Illinois Environmental Protection Act (415 ILCS 5/1 *et seq.* (West 2014)), where the permit included a special condition "mandating that [the permittee's] effluent cannot cause or contribute to water quality violations." *Prairie Rivers*, 2016 IL App (1st) 150971, ¶ 39. We noted that the Environmental Protection Act specifically required that such permits contain "sufficiently stringent" terms, conditions, and schedules of compliance to " 'ensure' " that the permittee's effluent discharges comply with numeric federal and state water quality regulations. *Id.* ¶ 26. Given these requirements, we concluded that "the special condition did not ensure compliance with water quality standards as it gave no guidance as to what was expected from the [permittee], nor did it allow the IEPA to determine whether the [permittee] was violating water quality standards." *Id.* ¶ 41. Here, unlike in *Prairie Rivers*, the Act does not require permits to include "sufficiently stringent" terms, nor does the Act mandate that the Department "ensure" that permittees comply with specific conservation practices. Rather, the Act charges the Department with developing a water conservation program to apportion Lake Michigan water and directs it to require that water users employ "all reasonably available means" to conserve water resources. The Department, through Rule 307, has identified conservation practices that each specific user must undertake as a condition of receiving a water allocation permit and the District's permit requires it to comply with Rule 307. As such, the permit gives the District guidance as to what is expected from it and it allows the Department to determine whether the District has violated the terms of its permit. As such, we find *Prairie Rivers* to be distinguishable from the instant case.

¶ 59    The plaintiffs' final contention regarding Rule 307 is that the Department's interpretation of Rule 307 contravenes the mandates of the Compact. We conclude, as we did for Rule 304, that the plaintiffs' argument is unavailing. As mentioned, the Compact commits Illinois to promoting "measures, methods, technologies or practices for *** reducing a Withdrawal, Consumptive Use, or Diversion." 45 ILCS 147/5 (West 2014) ("Section 1.2. Definitions."). Illinois accomplishes this through Rule 307, which conditions each permit on the users' implementation of the conservation practices contained therein. See 17 Ill. Adm. Code 3730.307(c) (2014). Therefore, the Department's interpretation does not contravene the plain language of the Compact.

¶ 60    Having determined that the Department did not err by interpreting that its Rules do not allow for consideration of specific conservation practices during a permit modification proceeding, we also conclude that the Department did not abuse its discretion when it denied the plaintiffs' efforts to introduce evidence and request discovery relating to specific conservation practices. See *Trettenero*, 333 Ill. App. 3d at 801; see also *Three Angels*

*Broadcasting Network, Inc. v. Department of Revenue*, 381 Ill. App. 3d 679, 700-01 (2008) (finding that agency did not abuse its discretion by excluding testimony irrelevant to ultimate disputed issue).

¶ 61    The plaintiffs next argue that the Department erred when it used partial compliance with the PCB's DO standard to determine the District's modified discretionary diversion allocation.

¶ 62    The plaintiffs first contend that the Department erred in using the DO standard because the Act mandates that the Department apportion water "to maintain [the CAWS] in a reasonably satisfactory sanitary condition." 615 ILCS 50/3 (West 2014). According to the plaintiffs, the DO standard fails to satisfy this mandate because DO is not a relevant proxy for a "sanitary condition" as it does not relate to "public health or to waste disposal." The Department responds that the Act does not define the phrase "reasonably satisfactory sanitary condition" and, therefore, left it to the Department to interpret that phrase. The Department also responds that all of the evidence presented during the hearing disputes the plaintiffs' contention that DO is not a relevant proxy for a "sanitary condition."

¶ 63    The Department is correct that the Act does not define what it means to maintain the CAWS in a "reasonably satisfactory condition" and so left that determination to the Department. As such, we give substantial weight and deference to the Department's reasonable interpretation. *Church*, 164 Ill. 2d at 161-62; *People v. Marshall*, 242 Ill. 2d 285, 297 (2011) (finding that silence "in the statutory language creates an ambiguity" that requires giving "substantial weight and deference" to the interpretation of the "agency charged with the administration and enforcement of the statute"). Moreover, according to the record, the Department has been using the DO standard for determining the allocation of water to maintain the CAWS in a "reasonably satisfactory sanitary condition" for over 50 years. The Department stated in its initial water allocation order that "DO is affected by or affects most of the parameters used to measure pollution and therefore *** an analysis of [DO] levels [is] an adequate indicator of water quality." Moreover, the Department stated that "[t]he purpose of the discretionary flows *** is to add oxygen to the waterways to maintain sanitary (aerobic) conditions and to disperse local pollution loadings." Given that this is the Department's longstanding interpretation, it is entitled to "substantial deference." *Illinois Bell*, 362 Ill. App. 3d at 657 ("The longer an agency has adhered to an interpretation of the statute, the more weight the interpretation deserves ***."). We also note that, in the 50 years of applying this regulatory system, the General Assembly has never amended section 5 to suggest that the Department's water conservation program was deficient, which suggests that the agency has correctly interpreted the Act's mandate. See *People ex rel. Birkett v. City of Chicago*, 202 Ill. 2d 36, 53-54 (2002) (deferring to agency's reasonable interpretation of statute in its regulations where legislature never intervened). Consequently, we conclude that the Department did not err when it used the DO regulatory standard to determine the amount of water the District required to maintain the CAWS in "reasonably satisfactory sanitary condition" under section 5 of the Act.

¶ 64    The plaintiffs also argue that the Rules twice reference water quality "standards," which they contend supports their argument that the Department was required to consider more than one standard to determine the District's allocation amount. The Department responds that nothing in the Rules' plain language requires that it consider all of the water quality standards when determining an allocation of water. The Department further responds that it did not "refuse" to consider other water quality standards; rather, the plaintiffs failed to either present evidence of an alternative water quality standard for the Department to consider or to challenge

the qualifications of those who testified in support of using the PCB DO standard. We agree with the Department.

¶ 65   Rule 303 defines the various categories of water users, with subsection (a)(4) defining one category as "[a]pplicants whose water demands are for the minimum discretionary dilution flows necessary to meet water quality standards in the [CAWS]." 17 Ill. Adm. Code 3730.303(a)(4) (2014). This reference to "water quality standards" does not impose any obligation on the Department. Rather, Rule 303 references water quality "standards" because it is undisputed that the CAWS is subject to multiple regulatory standards related to water quality. However, the plaintiffs point to nothing in the Rules requiring that the Department consider all regulatory standards applicable to the CAWS when determining the District's allocation of water. Consequently, the Department did not err when using the DO regulatory standard to determine the District's allocation of water.

¶ 66   That said, we note that nothing in the Department's order suggests that it did, in fact, refuse to consider other water quality standards when it determined the District's water allocation. Instead, the record establishes that all of the relevant testimony during the administrative proceeding was in favor of using the DO regulatory standard and the 95% compliance rate because that was the best indicator of water quality in the CAWS. Dr. Melching testified on behalf of the District that "DO remains the primary indicator of water quality attainment (the sanitary condition) in the CAWS and is the most important beneficiary of discretionary diversion." Twait and Injerd testified in support of both using the DO standard and the 95% compliance rate. The plaintiffs chose not to present evidence to contradict the considerable testimony in support of using the DO standard during the administrative hearing, nor did they offer an alternative standard for determining the discretionary diversion amount. We, therefore, conclude that the Department did not err in interpreting its Rules when it modified the District's permit to increase its diverted water amount to a level that would ensure partial compliance with the PCB DO standard.

¶ 67   In sum, we conclude that the Department did not err when it determined the District's modified allocation amount based on a 95% compliance rate with the PCB's DO standard, as this has been the Department's longstanding and reasonable interpretation of its obligations under the Act and the Rules and the only relevant testimony presented during the administrative hearing was in support of both the standard and the compliance rate.

¶ 68   For these reasons, we affirm the judgment of the circuit court of Cook County.

¶ 69   Affirmed.