NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 250398-U

NO. 4-25-0398

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 7, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| CHRONISTER OIL COMPANY, d/b/a Qik-n-EZ, | ) | Appeal from the |
| Petitioner-Appellant, | ) | Pollution Control Board |
| v. | ) | |
| THE POLLUTION CONTROL BOARD and THE | ) | PCB 24-50 |
| ENVIRONMENTAL PROTECTION | ) | |
| AGENCY, | ) | |
| Respondents-Appellees. | ) | |

JUSTICE GRISCHOW delivered the judgment of the court.
Justices Doherty and Harris concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The appellate court reversed and remanded, concluding the Pollution Control
Board erred in granting summary judgment in favor of the Environmental
Protection Agency because there existed a genuine issue of material fact as to
whether the Agency-imposed project labor agreement requirement applied
retroactively to the portion of a corrective action plan and budget for leaking
underground storage tank remediation that had already been completed prior to
submission of the corrective action plan and budget, and therefore, was a proper
basis for the Agency's denial of reimbursement.

¶ 2    Petitioner, Chronister Oil Company (Chronister Oil), submitted a reimbursement

request to the Environmental Protection Agency (Agency) for payment from the Underground

Storage Tank Fund (UST Fund) pursuant to its corrective action plan and budget for past

corrective action to remediate petroleum releases from underground storage tanks (USTs) on its

property. The Agency denied Chronister Oil's reimbursement request because the corrective

action plan and budget required use of a project labor agreement (PLA) and a PLA certification

was not submitted with the reimbursement package, certain costs included had previously been

submitted and paid, and certain costs were incurred prior to notice of the release being given to Agency. Chronister Oil appealed the Agency's decision to the Pollution Control Board (Board), and the parties filed cross-motions for summary judgment. The Board determined no genuine issue of material fact existed and granted the Agency's motion for summary judgment. The Board determined the issue as to whether it was appropriate for the Agency to require a PLA certification for work completed prior to the submission of the corrective action plan and budget was not before it because Chronister Oil failed to challenge the Agency's decision to require a PLA when it conditionally approved the corrective action plan and budget. The Board concluded, therefore, that the Agency properly denied reimbursement from the UST Fund because Chronister Oil failed to include a PLA certification with the payment request. Chronister Oil appeals. We reverse and remand for further proceedings.

¶ 3                                    I. BACKGROUND

¶ 4                     A. The Site and Original Releases From the USTs

¶ 5          Chronister Oil owns a self-service fueling station operating under the name Qik-n-EZ in Springfield, Illinois. During the 1990s, the prior owner of the property had reported gasoline releases from USTs on three separate occasions to the Illinois Emergency Management Agency (IEMA) (incident Nos. 94-2157, 96-1540, and 99-1835). Remediation had not been completed, as the Agency had not issued a "No Further Remediation Letter" regarding these incidents. See 415 ILCS 5/58.10(a) (West 2020).

¶ 6          In November 2019, Chronister Oil filed elections to proceed as owner for two of the incidents reported by the prior owner (incident Nos. 96-1540 and 99-1835) and indicated it would continue to investigate and follow up regarding filing an election as to the third incident (incident No. 94-2157). By electing to proceed as owner as defined in section 57.2 of the

Environmental Protection Act (Act) (*id.* § 57.2), Chronister Oil would be eligible to access the UST Fund for payment of costs related to remediation of the releases. See *id.* § 57.9(a)). Later, in March 2021, Chronister Oil submitted an election to proceed as owner for incident No. 94-2157, which was approved by the Agency. Two gasoline USTs and one diesel fuel UST remained on the site.

¶ 7 The Office of the Illinois State Fire Marshall (OSFM) acknowledged it received separate reimbursement eligibility and deductible applications from Chronister Oil in November 2019 for incident Nos. 96-1540 and 99-1896. In response, the OSFM informed Chronister Oil it was eligible to seek payment of costs for corrective action in response to the releases from the USTs on the site, and the company was instructed to contact the Agency to receive a packet of Agency billing forms for submitting any request for payment.

¶ 8                    B. Permits Issued by the OSFM

¶ 9 In November 2020, the OSFM issued a permit for the removal of the two remaining gasoline tanks and a permit for the abandonment of the diesel tank because it was located under the south wall of the station building on the site and its removal could compromise the building structure. The special contingencies in the permit indicated Chronister Oil would uncover concrete and materials over the existing USTs; remove and dispose of all remaining liquid; remove the two gasoline USTs, piping and vent lines; abandon and fill the diesel fuel tank with inert material in a manner to prevent it from moving or compromising the existing building structure; and dispose of the tank system offsite. The permit regarding the diesel fuel tank stated it was void "if contamination is revealed during the abandonment procedures or if tanks are not as indicated on [Chronister Oil's] granted permit site plan. If contamination is revealed, this abandonment can continue only when the contamination site section (2) of the certification on

site condition has been submitted to [OSFM]."

¶ 10          C. Initial Remediation Work and Discovery of New Release on the Site

¶ 11          In December 2020, Chronister Oil commenced work to remove or otherwise address the leaking USTs and contaminated soil on the site. Chronister Oil engaged the services of CW³M Company (CW³M), an environmental consulting company. During removal of the USTs, the OSFM observed a release of petroleum and required Chronister Oil to report it as a new incident. Chronister Oil did so on December 9, 2020 (incident No. 2020-1063). On December 11, 2020, the Agency notified Chronister Oil it was required to comply with the Leaking Underground Storage Tank (LUST) Program, including "the submittal of applicable documentation on forms prescribed and provided by the [Agency]."

¶ 12          In January 2021, Chronister Oil submitted a 45-day report for incident No. 2020-1063 to the Agency, as required by section 731.163(b) of Title 35 of the Administrative Code (35 Ill. Adm. Code 731.163(b) (eff. July 13, 2016)). The report explained that during removal of the UST for incident No. 96-1540, a "continued release" was observed from the diesel UST and OSFM required this release to be reported as a new incident. Excavation confirmed the release. The project manager was contacted regarding the "on-going corrective work in light of the new incident."

¶ 13          The report described that the early action activities included removal of two USTs, removal of only 15 feet of piping (because Chronister Oil planned to insert new tanks and connect them to existing piping), and abandonment of the diesel tank due to its location and the process of filling it with sand. The report stated that approximately 1183.01 cubic yards of contaminated backfill was removed and taken to a landfill and soil samples confirmed the presence of contamination. The report further noted secondary excavation was completed to

- 4 -

provide space for the new USTs to be installed. The report concluded:

> "Based on samplings and observations by representatives of [CW³M], it was determined that a release had occurred from the USTs on the property. To avoid further migration of contamination and allow room from excavation for new tanks, removal of the contaminated backfill was deemed prudent. The abandonment and removal of the USTs was conducted on December 7, 2020[,] to December 14, 2020, under the supervision of the OSFM. Contaminated backfill material was removed to a licensed landfill from December 7, 2020[,] through December 18, 2020."

> ***

> Upon approval of the 45-Day Report, CW³M will proceed with the Corrective Action Plan being developed to address all of the contamination at the facility."

This 45-day report was approved by the Agency and confirmed Chronister Oil's reporting requirements had been fulfilled.

¶ 14        In August 2021, the OSFM acknowledged receipt of another reimbursement eligibility and deduction application from Chronister Oil for the subsequent release discovered when remediation commenced (incident No. 2020-1063) and informed the company it was eligible to seek payment of costs for corrective action and again instructed them to contact the Agency to begin the process of applying for reimbursement.

¶ 15        D. Agency Consideration of Chronister Oil's Claims

¶ 16        1. *Reimbursement Requests for Early Action Remediation Costs*

¶ 17        In September 2021, CW³M submitted to the Agency a budget and billing package

on behalf of Chronister Oil, seeking approval for early action costs for incident No. 2020-1063 and requesting reimbursement from the UST Fund. CW³M sought $13,132.65 for preparing the 45-day report and for laboratory analysis. The Agency approved payment of $7,311.34, withholding a $5,000 deductible and declining certain costs either deemed unreasonable or for work that occurred before the incident was reported. Chronister Oil was advised of its right to appeal this final decision to the Board withing 35 days. See 415 ILCS 5/57.7(c)(4) (West 2020).

¶ 18    On March 22, 2022, Chronister Oil's new environmental consultant, Green Wave Consulting, LLC (GWC), submitted a second budget and billing package to the Agency, seeking an additional reimbursement for early action costs for incident No. 2020-1063. It sought $57,987.33 as reimbursement for the costs of excavating and disposing of four feet of contaminated backfill during early action for this incident, as well as analytical and consulting costs. The Agency approved payment of $50,833.79, reflecting deductions for costs associated with duplicative billing and other costs which lacked supporting documentation or exceeded the minimum requirements. Chronister Oil was again informed of its rights to appeal this final decision.

¶ 19    2. *Chronister Oil's Corrective Action Plan and Budget*

¶ 20    Also on March 22, 2022, GWC submitted on behalf of Chronister Oil a corrective action plan and budget listing all four of the release incidents that occurred on the site. In a letter accompanying the plan, Chronister Oil requested a PLA not be required for the activities proposed in the plan, explaining, "The requirement of a PLA on this project will only delay the implementation of the corrective action steps that need to be taken. By not requiring a [PLA], the proposed corrective action activities will be able to be completed in a more expeditious and timely manner." (Emphasis omitted.) GWC further stated a PLA would not advance the State's

- 6 -

interests and "[t]he work could be scheduled immediately if the PLA requirement was rescinded, thereby increasing efficiency to the state and ultimately leading to faster completion of the required site closer activities." GWC stated quality and safety would be "ensured" without a PLA because the activities would be completed by capable, skilled personnel with experience and training in performing activities at LUST sites. Finally, GWC stated, "Additionally[,] as a portion of this work has been previously completed due to needs at the site, a PLA cannot be implemented retroactively."

¶ 21 The corrective action plan and budget addressed two separate categories of corrective action and two separate budgets: one for proposed future corrective action not yet performed and one for corrective action previously completed in December 2020.

¶ 22 Regarding the future corrective action, Chronister Oil proposed removing the station building, its foundation, and the canopy and excavating 6,570 cubic yards of contaminated soil and disposing of it in a landfill. It would also manage groundwater encountered during excavation. Thereafter, Chronister Oil would collect and monitor confirmation soil samples from the sidewalls and floor of the excavation cavity and overburden backfill samples. Upon completion of soil remediation, Chronister Oil would backfill the excavation cavity, cover the area with pavement, and replace three monitoring wells. It would continue to monitor groundwater and conduct soil gas sampling. The budget for this portion of the corrective action plan was $867,698.08.

¶ 23 Regarding previously completed corrective action, Chronister Oil referred to the work completed in December 2020, when it removed two USTs and abandoned another UST, and the associated sampling, analytics, and other remedial action, including excavation, removal, backfilling, and paving. The corrective action plan stated this work was done "in association with

- 7 -

the installation of new USTs in the same area of the former USTs" and was for costs "not expended during the Early Action activities." The corrective action plan referred to these actions as corrective activities that occurred in the past and at different rates than the proposed future activities; therefore, Chronister Oil prepared the separate budget "for those costs not included with those associated with Early Action activities associated with the 2020 LUST incident, reported during the removal of the three (3) USTs." The budget for this past work was $111,682.56.

¶ 24                                      3. *Agency's July 2022 Decision*

¶ 25        On July 22, 2022, the Agency issued its decision letter conditionally approving the corrective action plan and budget with modifications, which included changes to groundwater monitoring plans. The Agency's letter also stated it determined the use of a PLA was required for the work described in the corrective action plan. Chronister Oil was instructed to complete the approved model PLA form. Once a fully executed PLA was submitted, a copy would be returned to Chronister Oil's environmental consultant so they would know when work conducted under the PLA could begin. Chronister Oil would also be required to certify that work for which a PLA was required was performed under the PLA when applying for payment from the UST Fund. Accompanying the Agency's decision letter was a "Notice of Project Labor Agreement Requirement," which further advised Chronister Oil that a PLA was required for the work included in the corrective action plan for which Chronister Oil sought payment from the UST Fund.

¶ 26        The Agency evaluated the two budgets presented in the corrective action plan separately. Regarding the budget submitted for future corrective action, the Agency modified certain costs and approved a total of $871,439.57. These modifications were explained in detail

in an attachment to the Agency's decision letter. As to the budget submitted for completed corrective action, the Agency modified certain costs, including vehicle charges and certain engineering costs, and approved a total of $109,77.85. These modifications were explained in detail in an attachment to the Agency's decision letter. Chronister Oil was advised of its right to appeal this final decision of the Agency.

¶ 27    4. *Chronister Oil's Reimbursement Request for Past Costs Under the Corrective Action Plan*

¶ 28    On July 7, 2023, GWC, on behalf of Chronister Oil, filed two reimbursement claims with the Agency.

¶ 29    The first reimbursement claim sought payment pursuant the corrective action plan and budget regarding future corrective action costs in the amount of $11,068.70 for consulting fees. The letter acknowledged the PLA did not apply to these costs. This request was approved by the Agency.

¶ 30    The second reimbursement claim was made pursuant to the corrective action plan and budget for past completed corrective action costs in the amount of $109,770.86. In its cover letter, GWC stated, "Although there is a [PLA] for this site, the activities requested for reimbursement were conducted prior to the establishment of the PLA requirement."

¶ 31    On January 3, 2024, the Agency determined it was unable to reimburse Chronister Oil for the past completed corrective action costs as requested. The Agency explained the claim was denied because the required PLA certification was not submitted with the reimbursement package, certain costs included had previously been submitted and paid, and certain costs were incurred prior to notice of the release being given to Agency. Chronister Oil was informed of its right to appeal this decision.

¶ 32    The record contains Agency documents from its internal review of this reimbursement claim: a handwritten notation on the Agency's LUST Claims Unit "LCTS Queue Date Tracking Worksheet" indicating "PLA[—]This budget was approved [with] a PLA. No PLA [documents] are in claim, we may have to deny this[.] See Brian B." A "Title XVI Payment Summary" document indicating the corrective action reimbursement was denied for the aforementioned reasons ("No PLA paperwork," "Duplicated billing," and "Items prior to IEMA").

¶ 33    The record also contains an internal Agency document entitled "Project Labor Agreement Determination," prepared after review of Chronister Oil's corrective action plan and budget on June 15, 2022. This standard-form document lists seven considerations (based upon the statutory findings in the Project Labor Relations Act (30 ILCS 571/5 (West 2022)) to be made in determining whether a PLA would be required; none were checked. The summary of fieldwork activities referenced in this determination was as follows:

> "The [corrective action plan] proposes [excavation, transportation, and disposal] of 6570 [cubic yards] of soil, razing the station building and foundation, removing the canopy, removing product piping. The [corrective action plan] proposes the collection of nine backfill samples, thirty sidewall samples, forty-three floor samples, and one soil gas sample. Reinstallation of three monitoring wells after excavation is proposed. The plan proposes 3830 square feet of six-inch thickness concrete pavement and 5420 square feet of four-inch thickness asphalt."

It appears the option for selecting that a PLA shall not be included was covered or whited out on the document and the option for selecting that a PLA would be required if payment from the UST Fund was requested for the PLA-type activities was checked.

¶ 34                              E. Proceedings Before the Board

¶ 35          Chronister Oil timely appealed the Agency's decision to deny payment of the past completed corrective action costs. Both parties moved for summary judgment.

¶ 36          Chronister Oil argued the PLA requirement could not legally be imposed retroactively, so it did not apply to the reimbursement request for past corrective action activities; the corrective action plan and budget was approved for all of the incidents, not just the 2020 incident; and the costs the Agency deemed duplicative were not duplicative because the Agency made a miscalculation regarding the conversion of the measurement of soil and backfill from tons to cubic yards. Chronister Oil argued the approved budget for corrective action included the work performed in December 2020. It conceded a deduction of $4,996.39 and argued the remaining $104,774.46 should have been reimbursed.

¶ 37          The Agency argued Chronister Oil's corrective action activities in December 2020, which included the secondary excavation of approximately 725 cubic yards of soil related to the new UST installation, were done without having an Agency-approved corrective action plan and budget. While such activity is permitted, Chronister Oil was clearly warned that proceeding to conduct such corrective activities prior to an approved corrective action plan and budget might result in less than full payment from the UST Fund. See 35 Ill. Adm. Code 734.335(d) (eff. March 1, 2006) (Board Note). When the corrective action plan and budget was submitted, the Agency required a PLA be included for all work completed. Chronister Oil had the opportunity to appeal that decision but failed to do so at that time. The Agency argued the PLA requirement applied to the entire plan, both future and completed work, "[o]therwise, an owner or operator could always circumvent a PLA certification requirement by simply proceeding with corrective action activities before submitting a corrective action plan or budget."

The Agency argued, therefore, Chronister Oil's request for reimbursement was properly denied due to its own decisions to take corrective action before submitting a corrective action plan and budget and failing to include a PLA certification as required by the subsequently approved corrective action plan and budget.

¶ 38       On March 20, 2025, the Board found no genuine issue of material fact existed and granted the Agency's motion for summary judgment. The Board found the Agency properly denied reimbursement from the UST Fund because Chronister Oil failed to include a PLA certification with the payment request. The Board determined the Agency's July 2022, decision letter was "unambiguous" and a PLA was required for reimbursement for work performed under the corrective action plan and budget. The Board stated,

> "[Chronister Oil] offers several arguments as to why the imposition of a
> PLA in the July 22, 2022 decision letter could only possibly apply to future work.
> The Board is cognizant of those arguments. However, the time to raise those
> arguments would have been in an appeal of the decision by [the Agency] to
> require the PLA in June of 2022. Undertaking corrective action at a site, without a
> corrective action plan and budget in place is acceptable. The rules make clear,
> though, undertaking such actions could result in failure to receive reimbursement.
> *See* 35 Ill. Adm. Code 734.335(d) [(eff. March 1, 2006)]. It is also clear that a
> PLA may be required for corrective action and PLAs have been a part of the UST
> program since 2011. *See* 30 ILCS 571/10 (2022). Thus, [Chronister Oil] assumed
> the risk that it would not be reimbursed when completing corrective action prior
> to receiving approval from [the Agency] for its corrective action and budget."

Because Chronister Oil failed to challenge the Agency's decision to require a PLA for corrective action activities, the Board concluded the issue as to whether it was appropriate to require a PLA certification for work completed prior to the submission of the corrective action plan was not before it.

¶ 39　　　This appeal followed.

¶ 40　　　　　　　　　　　II. ANALYSIS

¶ 41　　　Chronister Oil argues the Board's decision to grant the Agency's motion for summary judgment should be reversed because the PLA certification requirement should have been deemed inapplicable to its payment application for past corrective action taken at the site. In support, Chronister Oil contends the PLA determination could not apply retroactively and it was not precluded from challenging the application of the PLA when seeking payment from the Agency.

¶ 42　　　Any party adversely affected by a final order or determination of the Board may obtain judicial review in the appellate court. 415 ILCS 5/41(a) (West 2024). When reviewing the Board's decision to grant summary judgment (35 Ill. Adm. Code 101.516(b) (eff. Aug. 22, 2019)), this court employs the *de novo* standard of review. *Prairie Rivers Network v. Illinois Pollution Control Board*, 2016 IL App (1st) 150971, ¶ 23. Because the parties filed cross-motions for summary judgment, they have agreed that no genuine issues of material fact exist and that only a question of law is involved. "However, the mere filing of cross-motions for summary judgment does not establish that there is no issue of material fact, nor does it obligate the Board to render summary judgment." *Id.* ¶ 24.

¶ 43　　　　　　　　　　A. Applicable Law

¶ 44　　　The LUST Program is part of the Act that establishes the procedures for

remediation of UST sites due to the release of petroleum products and establishes requirements for eligible owners and operators of UST sites "to seek payment for any costs associated with physical soil classification, groundwater investigation, site classification and corrective action from the [UST] Fund." 415 ILCS 5/57 (West 2022). The LUST Program is administered by the OSFM and the Agency. *Id.* § 57.3. When an owner or operator of a UST site discovers a release, they are obligated to comply with the reporting and response requirements set forth in the Act and its regulations. *Id.* § 57.6(a). These owners and operators may engage in certain "early action[s]" prior to submission of a corrective action plan to the Agency by, at a minimum, removing or abandoning the USTs in accordance OSFM regulations and removing visibly contaminated fill material and ground water showing a sheen. *Id.* § 57.6(b). The Act provides, "[f]or purposes of payment for early action costs, however, fill material shall not be removed in an amount in excess of 4 feet from the outside dimensions of the tank." *Id.*

¶ 45        Section 57.7 of the Act provides the procedures for obtaining Agency approval for site investigations and corrective action as it relates to leaking USTs beyond early action activities. *Id.* § 57.7. The Act provides any owner or operator intending to seek payment from the UST Fund (*id.* § 57.11(a)) must submit a corrective action plan and budget for Agency approval before proceeding with the corrective action. *Id.* § 57.7(a)(2)-(4); see 35 Ill. Adm. Code 734.335(b) (eff. March 1, 2006) (requiring any owner or operator seeking payment from the UST Fund to submit a corrective action plan and budget prior to conducting any corrective action beyond site investigation). Part of this Agency approval process includes determining whether (1) the costs associated with the plan are reasonable and will be incurred in the performance of site investigation or corrective action and only to meet the minimum requirements of the LUST Program and (2) the corrective action shall include a PLA if payment from the UST Fund is to be

- 14 -

requested. 415 ILCS 57.7(c)(3) (West 2022); see 30 ILCS 571/5, 10 (West 2022) (The Project Labor Agreements Act provides that a PLA (a prehire collective bargaining agreement) may be required for public works projects, which includes any corrective action for which payment from the UST Fund is requested, to ensure the highest standards of quality and efficiency at the lowest responsible cost). Any action by the Agency to disapprove or modify a corrective action plan "shall be subject to appeal to the Board in accordance with Section 40 [(of the Act)]." 415 ILCS 5/57.7(c)(4) (West 2022).

¶ 46        An owner or operator of a UST site may proceed to conduct site investigation or corrective action *prior* to the submittal or approval of a corrective action plan or budget. However, if the owner or operator elects to proceed in this manner, they still must file a corrective action plan and budget to the Agency which details "the steps taken to determine the type of site investigation or corrective action which was necessary at the site along with the site investigation or corrective action taken or to be taken, in addition to costs associated with activities to date and anticipated costs." *Id.* § 57.7(e)(1). These procedures are outlined in the applicable administrative rules as well. See 35 Ill. Adm. Code 734.335(d) (eff. March 1, 2006) (providing an owner or operator may proceed to conduct corrective action activities prior to submittal or approval of a corrective action plan and budget, but a corrective plan and budget must be submitted for review, approval, rejection, or modification prior to any payment for related costs). Importantly, the Board note to section 734.335(d) advises owners or operators who submit a corrective action plan after corrective action has already commenced or been completed that they may not be entitled to full payment from the UST Fund. *Id.*

¶ 47        When the Agency receives a corrective action plan and budget submitted after corrective activities have commenced at the site, the review process is the same as otherwise

required by the Act. 415 ILCS 5/57.7(e)(2) (West 2022). If the Agency does not approve all or part of the costs, the owner or operator may appeal the decision to the Board. *Id.* The owner or operator will only be eligible to reimburse those disapproved costs if the Board determines those costs were eligible for payment. *Id.*

¶ 48 Upon completion of corrective action measures, the owner or operator may submit an application for payment from the UST Fund. *Id.* § 57.8(a). The Act limits the Agency's review in the case of any approved plan and budget for which payment is being sought as follows: "The Agency's review shall be limited to generally accepted auditing and accounting practices. In no case shall the Agency conduct additional review of any plan which was completed within the budget, beyond auditing for adherence to the corrective action measures in the proposal." *Id.* § 57.8(a)(1). A completed application must include a PLA and certification that the work was performed in compliance with the PLA if the Agency determined the corrective action plan must include one. *Id.* § 57.8(a)(6)(F).

¶ 49                                   B. This Case

¶ 50 At issue in this case is the Agency's denial of payment from the UST Fund for corrective action that was completed prior to the submission of a corrective action plan and budget. Chronister Oil acknowledges the activity for which they sought payment was corrective action that was completed in December 2020. Likewise, Chronister Oil acknowledges that submission of a corrective action plan and budget is generally required *prior* to corrective action being taken. However, when Chronister Oil submitted its corrective action plan and budget for the already completed work in March 2022, it expressly requested that a PLA not be required. Among the reasons Chronister Oil stated for requesting no PLA be required was that a portion of the remediation work had been "previously completed due to needs at the site" and a "PLA

- 16 -

cannot be implemented retroactively."

¶ 51       Chronister Oil presented two separate budgets in the corrective action plan, one for the corrective action completed in December 2020 and one for the future corrective action. The Agency "conditionally approved" Chronister Oil's corrective action plan as to both budgets with one itemized modification regarding monitoring well sampling. In reviewing the separate budget for corrective action completed in December 2020, the Agency acknowledged the budget was for "corrective action remediation *completed* following tank removal" and noted the budget was *approved* with certain modification to the calculations. (Emphasis added.) The July 2022 decision letter also stated the Agency had determined that the use of a PLA was required. However, in referring to the PLA requirement, the decision letter stated that once the PLA was submitted, a fully executed copy would be returned to Chronister Oil's environmental consultant so they "will know when work conducted under the PLA *may begin*," which is an implicit reference to future work under the plan. (Emphasis added.)

¶ 52       Under the circumstances, we conclude the Board erred in determining the Agency's July 2022 decision letter was "unambiguous." A PLA is "a form of *pre-hire* collective bargaining agreement covering all terms and conditions of employment on a specific project." (Emphasis added.) 30 ILCS 571/5(b) (West 2022). When outlining the requirement of the use of a PLA in its decision letter, the Agency did not differentiate between the past and future corrective actions described in the corrective action plan and budgets. However, the discussion of the PLA requirement in the decision letter focused on remediation work that has not yet been negotiated for execution with any labor force. It is illogical to assume this included work that had been completed two years earlier. This ambiguity led Chronister Oil to believe the Agency had approved the budget requested for the December 2020 corrective action and the budget for future

corrective action was what would require the use of a PLA. However, when the Agency subsequently denied payment for the past corrective action it had already approved, the overriding reason given was Chronister Oil's failure to certify that the remediation work had been completed in accordance with a PLA. The Agency's stated reason for subsequently denying payment for the approved budget for past corrective action is paradoxical—the Agency approved Chronister Oil's completed remediation activity while also requiring the use of a PLA, which, by definition, would have been an impossibility for work that was already completed. Chronister Oil's decision to submit the corrective action plan and budget for the remediation work completed in December 2022 invited the possibility that it may not be entitled to full payment from the UST Fund. See 35 Ill. Adm. Code 734.335(d) (eff. March 1, 2006). Still, it is unclear why the Agency would review, adjust, and approve a budget for completed remediation work only to reject payment for that work due to an impossible retroactively applied prerequisite. We, therefore, find there exists a genuine issue of material fact as to the interpretation of the Agency's July 2022 decision letter regarding the application of the PLA in this case.

¶ 53　　　　The Board concluded the question of whether it was appropriate for the Agency to require a PLA for the past corrective action was not before it because Chronister Oil failed to challenge the Agency's March 2022 decision letter as a final and appealable decision. We cannot agree. Chronister Oil did not appeal that decision when it was issued because Chronister Oil got what it requested, which was approval of a corrective action plan and budgets for past and future corrective activity on the site. It was consistent with the plain language of the Project Labor Agreements Act for Chronister Oil to conclude the Agency intended the PLA requirement to apply only to the future corrective action under the plan. Thus, the controversy did not arise until the Agency denied Chronister Oil payment for the lack of a PLA certification in its subsequent

decision letter in January 2024. See *National Marine, Inc. v. Illinois Environmental Protection Agency*, 159 Ill. 2d 381, 390 (1994) (noting an actual controversy must be shown to exist for a claim to be justiciable). The Agency essentially changed its position regarding approval of the budget for the corrective action completed in December 2020 because the Agency had to know a post-completion PLA was an impossibility. If the Agency determined that a PLA was a prerequisite for any reimbursement from the UST Fund in this case, which was within its authority, the Agency could have rejected the corrective action plan and budget for the work completed in December 2020 for that reason. Instead, the July 2022 decision letter led Chronister Oil to believe that all that remained with respect to the budget for the December 2020 remediation work was to apply for payment and there would be no further review of the corrective action plan by the Agency except for generally accepted auditing and accounting practices. See 415 ILCS 5/57.8(a)(1) (West 2022).

¶ 54 In sum, we reverse the Board's decision granting the Agency's motion for summary judgment. We conclude there exists a genuine issue of material fact as to the interpretation of the Agency's July 2022 decision letter regarding whether the PLA requirement applied to Chronister Oil's approved budget for past corrective actions and was, therefore, a proper basis for denying payment for the already completed corrective action.

¶ 55                                   III. CONCLUSION

¶ 56 For the reasons stated, we reverse the Board's decision and remand for further proceedings.

¶ 57 Reversed and remanded.